# BERKEMER, SHERIFF OF FRANKLIN COUNTY, OHIO v. McCARTY

No. 83–710.   Argued April 18, 1984—Decided July 2, 1984

MARSHALL, J., delivered the opinion of the Court, in which BURGER, C. J., and BRENNAN, WHITE, BLACKMUN, POWELL, REHNQUIST, and O'CONNOR, JJ., joined. STEVENS, J., filed an opinion concurring in part and concurring in the judgment, *post*, p. 445.

*Alan C. Travis* argued the cause for petitioner. With him on the briefs was *Stephen Michael Miller*.

*R. William Meeks* argued the cause for respondent. With him on the brief were *Paul D. Cassidy, Lawrence Herman*, and *Joel A. Rosenfeld.**

JUSTICE MARSHALL delivered the opinion of the Court.

This case presents two related questions: First, does our decision in *Miranda* v. *Arizona*, 384 U. S. 436 (1966), govern the admissibility of statements made during custodial interrogation by a suspect accused of a misdemeanor traffic

---

*Anthony J. Celebrezze, Jr.*, Attorney General, and *Richard David Drake*, Assistant Attorney General, filed a brief for the State of Ohio as *amicus curiae* urging reversal.

*Jacob D. Fuchsberg* and *Charles S. Sims* filed a brief for the American Civil Liberties Union et al. as *amici curiae* urging affirmance.

offense? Second, does the roadside questioning of a motorist detained pursuant to a traffic stop constitute custodial interrogation for the purposes of the doctrine enunciated in *Miranda*?

# I

## A

The parties have stipulated to the essential facts. See App. to Pet. for Cert. A–1. On the evening of March 31, 1980, Trooper Williams of the Ohio State Highway Patrol observed respondent's car weaving in and out of a lane on Interstate Highway 270. After following the car for two miles, Williams forced respondent to stop and asked him to get out of the vehicle. When respondent complied, Williams noticed that he was having difficulty standing. At that point, "Williams concluded that [respondent] would be charged with a traffic offense and, therefore, his freedom to leave the scene was terminated." *Id.*, at A–2. However, respondent was not told that he would be taken into custody. Williams then asked respondent to perform a field sobriety test, commonly known as a "balancing test." Respondent could not do so without falling.

While still at the scene of the traffic stop, Williams asked respondent whether he had been using intoxicants. Respondent replied that "he had consumed two beers and had smoked several joints of marijuana a short time before." *Ibid.* Respondent's speech was slurred, and Williams had difficulty understanding him. Williams thereupon formally placed respondent under arrest and transported him in the patrol car to the Franklin County Jail.

At the jail, respondent was given an intoxilyzer test to determine the concentration of alcohol in his blood.[1] The test did not detect any alcohol whatsoever in respondent's system. Williams then resumed questioning respondent

---

[1] For a description of the technology associated with the intoxilyzer test, see *California* v. *Trombetta*, 467 U. S. 479, 481–482 (1984).

in order to obtain information for inclusion in the State Highway Patrol Alcohol Influence Report. Respondent answered affirmatively a question whether he had been drinking. When then asked if he was under the influence of alcohol, he said, "I guess, barely." *Ibid.* Williams next asked respondent to indicate on the form whether the marihuana he had smoked had been treated with any chemicals. In the section of the report headed "Remarks," respondent wrote, "No ang[el] dust or PCP in the pot. Rick McCarty." App. 2.

At no point in this sequence of events did Williams or anyone else tell respondent that he had a right to remain silent, to consult with an attorney, and to have an attorney appointed for him if he could not afford one.

## B

Respondent was charged with operating a motor vehicle while under the influence of alcohol and/or drugs in violation of Ohio Rev. Code Ann. § 4511.19 (Supp. 1983). Under Ohio law, that offense is a first-degree misdemeanor and is punishable by fine or imprisonment for up to six months. § 2929.21 (1982). Incarceration for a minimum of three days is mandatory. § 4511.99 (Supp. 1983).

Respondent moved to exclude the various incriminating statements he had made to Trooper Williams on the ground that introduction into evidence of those statements would violate the Fifth Amendment insofar as he had not been informed of his constitutional rights prior to his interrogation. When the trial court denied the motion, respondent pleaded "no contest" and was found guilty.[2] He was sentenced to 90

---

[2] Ohio Rev. Code Ann. § 2937.07 (1982) provides, in pertinent part: "If the plea be 'no contest' or words of similar import in pleading to a misdemeanor, it shall constitute a stipulation that the judge or magistrate may make [a] finding of guilty or not guilty from the explanation of circumstances, and if guilt be found, impose or continue for sentence accordingly."

Ohio Rule of Criminal Procedure 12(H) provides: "The plea of no contest does not preclude a defendant from asserting upon appeal that the trial

days in jail, 80 of which were suspended, and was fined $300, $100 of which were suspended.

On appeal to the Franklin County Court of Appeals, respondent renewed his constitutional claim. Relying on a prior decision by the Ohio Supreme Court, which held that the rule announced in *Miranda* "is not applicable to misdemeanors," *State* v. *Pyle*, 19 Ohio St. 2d 64, 249 N. E. 2d 826 (1969), cert. denied, 396 U. S. 1007 (1970), the Court of Appeals rejected respondent's argument and affirmed his conviction. *State* v. *McCarty*, No. 80AP–680 (Mar. 10, 1981). The Ohio Supreme Court dismissed respondent's appeal on the ground that it failed to present a "substantial constitutional question." *State* v. *McCarty*, No. 81–710 (July 1, 1981).

Respondent then filed an action for a writ of habeas corpus in the District Court for the Southern District of Ohio.[3] The District Court dismissed the petition, holding that "*Miranda* warnings do not have to be given prior to in custody interrogation of a suspect arrested for a traffic offense." *McCarty* v. *Herdman*, No. C–2–81–1118 (Dec. 11, 1981).

A divided panel of the Court of Appeals for the Sixth Circuit reversed, holding that "*Miranda* warnings must be given to *all* individuals prior to custodial interrogation, whether the offense investigated be a felony or a misdemeanor traffic offense." *McCarty* v. *Herdman*, 716 F. 2d 361, 363 (1983) (emphasis in original). In applying this principle to the facts of the case, the Court of Appeals distinguished between the statements made by respondent before and after his formal arrest.[4] The postarrest statements, the court ruled, were

court prejudicially erred in ruling on a pretrial motion, including a pretrial motion to suppress evidence."

[3] On respondent's motion, the state trial court stayed execution of respondent's sentence pending the outcome of his application for a writ of habeas corpus. *State* v. *McCarty*, No. 80–TF–C–123915 (Franklin County Mun. Ct., July 28, 1981).

[4] In differentiating respondent's various admissions, the Court of Appeals accorded no significance to the parties' stipulation that respondent's

plainly inadmissible; because respondent was not warned of his constitutional rights prior to or "[a]t the point that Trooper Williams took [him] to the police station," his ensuing admissions could not be used against him. *Id.*, at 364. The court's treatment of respondent's prearrest statements was less clear. It eschewed a holding that "the mere stopping of a motor vehicle triggers *Miranda*," *ibid.*, but did not expressly rule that the statements made by respondent at the scene of the traffic stop could be used against him. In the penultimate paragraph of its opinion, the court asserted that "[t]he failure to advise [respondent] of his constitutional rights rendered *at least some* of his statements inadmissible," *ibid.* (emphasis added), suggesting that the court was uncertain as to the status of the prearrest confessions.[5] "Because [respondent] was convicted on inadmissible evidence," the court deemed it necessary to vacate his conviction and order the District Court to issue a writ of habeas corpus. *Ibid.*[6] However, the Court of Appeals did not specify which statements, if any, could be used against respondent in a retrial.

We granted certiorari to resolve confusion in the federal and state courts regarding the applicability of our ruling in

"freedom to leave the scene was terminated" at the moment Trooper Williams formed an intent to arrest respondent. The court reasoned that a "'reasonable man' test," not a subjective standard, should control the determination of when a suspect is taken into custody for the purposes of *Miranda. McCarty* v. *Herdman,* 716 F. 2d, at 362, n. 1 (quoting *Lowe* v. *United States,* 407 F. 2d 1391, 1397 (CA9 1969)).

[5] Judge Wellford, dissenting, observed: "As I read the opinion, the majority finds that McCarty was not in custody until he was formally placed under arrest." 716 F. 2d, at 364. The majority neither accepted nor disavowed this interpretation of its ruling.

[6] Judge Wellford's dissent was premised on his view that the incriminating statements made by respondent after he was formally taken into custody were "essentially repetitious" of the statements he made before his arrest. Reasoning that the prearrest statements were admissible, Judge Wellford argued that the trial court's failure to suppress the postarrest statements was "harmless error." *Id.*, at 365.

*Miranda* to interrogations involving minor offenses[7] and to questioning of motorists detained pursuant to traffic stops.[8] 464 U. S. 1038 (1984).

---

[7] In *Clay* v. *Riddle*, 541 F. 2d 456 (1976), the Court of Appeals for the Fourth Circuit held that persons arrested for traffic offenses need not be given *Miranda* warnings. *Id.*, at 457. Several state courts have taken similar positions. See *State* v. *Bliss*, 238 A. 2d 848, 850 (Del. 1968); *County of Dade* v. *Callahan*, 259 So. 2d 504, 507 (Fla. App. 1971), cert. denied, 265 So. 2d 50 (Fla. 1972); *State* v. *Gabrielson*, 192 N. W. 2d 792, 796 (Iowa 1971), cert. denied, 409 U. S. 912 (1972); *State* v. *Angelo*, 251 La. 250, 254–255, 203 So. 2d 710, 711–717 (1967); *State* v. *Neal*, 476 S. W. 2d 547, 553 (Mo. 1972); *State* v. *Macuk*, 57 N. J. 1, 15–16, 268 A. 2d 1, 9 (1970). Other state courts have refused to limit in this fashion the reach of *Miranda.* See *Campbell* v. *Superior Court*, 106 Ariz. 542, 552, 479 P. 2d 685, 695 (1971); *Commonwealth* v. *Brennan*, 386 Mass. 772, 775, 438 N. E. 2d 60, 63 (1982); *State* v. *Kinn*, 288 Minn. 31, 35, 178 N. W. 2d 888, 891 (1970); *State* v. *Lawson*, 285 N. C. 320, 327–328, 204 S. E. 2d 843, 848 (1974); *State* v. *Fields*, 294 N. W. 2d 404, 409 (N. D. 1980) (*Miranda* applicable at least to "more serious [traffic] offense[s] such as driving while intoxicated"); *State* v. *Buchholz*, 11 Ohio St. 3d 24, 28, 462 N. E. 2d 1222, 1226 (1984) (overruling *State* v. *Pyle*, 19 Ohio St. 2d 64, 249 N. E. 2d 826 (1969), cert. denied, 396 U. S. 1007 (1970), and holding that "*Miranda* warnings must be given prior to any custodial interrogation regardless of whether the individual is suspected of committing a felony or misdemeanor"); *State* v. *Roberti*, 293 Ore. 59, 644 P. 2d 1104, on rehearing, 293 Ore. 236, 646 P. 2d 1341 (1982), cert. pending, No. 82–315; *Commonwealth* v. *Meyer*, 488 Pa. 297, 305–306, 412 A. 2d 517, 521 (1980); *Holman* v. *Cox*, 598 P. 2d 1331, 1333 (Utah 1979); *State* v. *Darnell*, 8 Wash. App. 627, 628, 508 P. 2d 613, 615, cert. denied, 414 U. S. 1112 (1973).

[8] The lower courts have dealt with the problem of roadside questioning in a wide variety of ways. For a spectrum of positions, see *State* v. *Tellez*, 6 Ariz. App. 251, 256, 431 P. 2d 691, 696 (1967) (*Miranda* warnings must be given as soon as the policeman has "reasonable grounds" to believe the detained motorist has committed an offense); *Newberry* v. *State*, 552 S. W. 2d 457, 461 (Tex. Crim. App. 1977) (*Miranda* applies when there is probable cause to arrest the driver and the policeman "consider[s the driver] to be in custody and would not . . . let him leave"); *State* v. *Roberti*, 293 Ore., at 236, 646 P. 2d, at 1341 (*Miranda* applies as soon as the officer forms an intention to arrest the motorist); *People* v. *Ramirez*, 199 Colo. 367, 372, n. 5, 609 P. 2d 616, 618, n. 5 (1980) (en banc); *State* v. *Darnell, supra,* at 629–630, 508 P. 2d, at 615 (driver is "in custody" for *Miranda* purposes at

## II

The Fifth Amendment provides: "No person . . . shall be compelled in any criminal case to be a witness against himself . . . ." It is settled that this provision governs state as well as federal criminal proceedings. *Malloy* v. *Hogan*, 378 U. S. 1, 8 (1964).

In *Miranda* v. *Arizona*, 384 U. S. 436 (1966), the Court addressed the problem of how the privilege against compelled self-incrimination guaranteed by the Fifth Amendment could be protected from the coercive pressures that can be brought to bear upon a suspect in the context of custodial interrogation. The Court held:

> "[T]he prosecution may not use statements, whether exculpatory or inculpatory, stemming from custodial interrogation of [a] defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination. By custodial interrogation, we mean questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way. As for the procedural safeguards to be employed, unless other fully effective means are devised to inform accused persons of their right of silence and to assure a continuous opportunity to exercise it, the

least by the time he is asked to take a field sobriety test); *Commonwealth* v. *Meyer, supra*, at 307, 412 A. 2d, at 521–522 (warnings are required as soon as the motorist "reasonably believes his freedom of action is being restricted"); *Lowe* v. *United States, supra*, at 1394, 1396; *State* v. *Sykes*, 285 N. C. 202, 205–206, 203 S. E. 2d 849, 850 (1974) (*Miranda* is inapplicable to a traffic stop until the motorist is subjected to formal arrest or the functional equivalent thereof); *Allen* v. *United States*, 129 U. S. App. D. C. 61, 63–64, 390 F. 2d 476, 478–479 ("[S]ome inquiry can be made [without giving *Miranda* warnings] as part of an investigation notwithstanding limited and brief restraints by the police in their effort to screen crimes from relatively routine mishaps"), modified, 131 U. S. App. D. C. 358, 404 F. 2d 1335 (1968); *Holman* v. *Cox, supra*, at 1333 (*Miranda* applies upon formal arrest).

following measures are required. Prior to any questioning, the person must be warned that he has a right to remain silent, that any statement he does make may be used as evidence against him, and that he has a right to the presence of an attorney, either retained or appointed." *Id.*, at 444 (footnote omitted).

In the years since the decision in *Miranda,* we have frequently reaffirmed the central principle established by that case: if the police take a suspect into custody and then ask him questions without informing him of the rights enumerated above, his responses cannot be introduced into evidence to establish his guilt.[9] See, *e. g.*, *Estelle* v. *Smith,* 451 U. S. 454, 466–467 (1981); *Rhode Island* v. *Innis,* 446 U. S. 291, 297–298 (1980) (dictum); *Orozco* v. *Texas,* 394 U. S. 324, 326–327 (1969); *Mathis* v. *United States,* 391 U. S. 1, 3–5 (1968).[10]

Petitioner asks us to carve an exception out of the foregoing principle. When the police arrest a person for allegedly committing a misdemeanor traffic offense and then ask him questions without telling him his constitutional rights, petitioner argues, his responses should be admissible against him.[11] We cannot agree.

---

[9] In *Harris* v. *New York,* 401 U. S. 222 (1971), the Court did sanction use of statements obtained in violation of *Miranda* to impeach the defendant who had made them. The Court was careful to note, however, that the jury had been instructed to consider the statements "only in passing on [the defendant's] credibility and not as evidence of guilt." 401 U. S., at 223.

[10] The one exception to this consistent line of decisions is *New York* v. *Quarles,* 467 U. S. 649 (1984). The Court held in that case that, when the police arrest a suspect under circumstances presenting an imminent danger to the public safety, they may without informing him of his constitutional rights ask questions essential to elicit information necessary to neutralize the threat to the public. Once such information has been obtained, the suspect must be given the standard warnings.

[11] Not all of petitioner's formulations of his proposal are consistent. At some points in his brief and at oral argument, petitioner appeared to advocate an exception solely for drunken-driving charges; at other points, he

One of the principal advantages of the doctrine that suspects must be given warnings before being interrogated while in custody is the clarity of that rule.

> "*Miranda's* holding has the virtue of informing police and prosecutors with specificity as to what they may do in conducting custodial interrogation, and of informing courts under what circumstances statements obtained during such interrogation are not admissible. This gain in specificity, which benefits the accused and the State alike, has been thought to outweigh the burdens that the decision in *Miranda* imposes on law enforcement agencies and the courts by requiring the suppression of trustworthy and highly probative evidence even though the confession might be voluntary under traditional Fifth Amendment analysis." *Fare* v. *Michael C.*, 442 U. S. 707, 718 (1979).

The exception to *Miranda* proposed by petitioner would substantially undermine this crucial advantage of the doctrine. The police often are unaware when they arrest a person whether he may have committed a misdemeanor or a felony. Consider, for example, the reasonably common situation in which the driver of a car involved in an accident is taken into custody. Under Ohio law, both driving while under the influence of intoxicants and negligent vehicular homicide are misdemeanors, Ohio Rev. Code Ann. §§ 2903.07, 4511.99 (Supp. 1983), while reckless vehicular homicide is a felony, § 2903.06 (Supp. 1983). When arresting a person for causing a collision, the police may not know which of these offenses he may have committed. Indeed, the nature of his offense may depend upon circumstances unknowable to the police, such as whether the suspect has previously committed

---

seemed to favor a line between felonies and misdemeanors. Because all of these suggestions suffer from similar infirmities, we do not differentiate among them in the ensuing discussion.

a similar offense [12] or has a criminal record of some other kind. It may even turn upon events yet to happen, such as whether a victim of the accident dies. It would be unreasonable to expect the police to make guesses as to the nature of the criminal conduct at issue before deciding how they may interrogate the suspect. [13]

Equally importantly, the doctrinal complexities that would confront the courts if we accepted petitioner's proposal would be Byzantine. Difficult questions quickly spring to mind: For instance, investigations into seemingly minor offenses sometimes escalate gradually into investigations into more serious matters; [14] at what point in the evolution of an affair of this sort would the police be obliged to give *Miranda* warnings to a suspect in custody? What evidence would be necessary to establish that an arrest for a misdemeanor offense

[12] Thus, under Ohio law, while a first offense of negligent vehicular homicide is a misdemeanor, a second offense is a felony. Ohio Rev. Code Ann. § 2903.07 (Supp. 1983). In some jurisdictions, a certain number of convictions for drunken driving triggers a quantum jump in the status of the crime. In South Dakota, for instance, first and second offenses for driving while intoxicated are misdemeanors, but a third offense is a felony. See *Solem* v. *Helm*, 463 U. S. 277, 280, n. 4 (1983).

[13] Cf. *Welsh* v. *Wisconsin*, 466 U. S. 740, 761 (1984) (WHITE, J., dissenting) (observing that officers in the field frequently "have neither the time nor the competence to determine" the severity of the offense for which they are considering arresting a person).

It might be argued that the police would not need to make such guesses; whenever in doubt, they could ensure compliance with the law by giving the full *Miranda* warnings. It cannot be doubted, however, that in some cases a desire to induce a suspect to reveal information he might withhold if informed of his rights would induce the police not to take the cautious course.

[14] See, *e. g.*, *United States* v. *Schultz*, 442 F. Supp. 176 (Md. 1977) (investigation of erratic driving developed into inquiry into narcotics offenses and terminated in a charge of possession of a sawed-off shotgun); *United States* v. *Hatchel*, 329 F. Supp. 113 (Mass. 1971) (investigation into offense of driving the wrong way on a one-way street yielded a charge of possession of a stolen car).

was merely a pretext to enable the police to interrogate the suspect (in hopes of obtaining information about a felony) without providing him the safeguards prescribed by *Miranda*?[15] The litigation necessary to resolve such matters would be time-consuming and disruptive of law enforcement. And the end result would be an elaborate set of rules, interlaced with exceptions and subtle distinctions, discriminating between different kinds of custodial interrogations.[16] Neither the police nor criminal defendants would benefit from such a development.

Absent a compelling justification we surely would be unwilling so seriously to impair the simplicity and clarity of the holding of *Miranda*. Neither of the two arguments proffered by petitioner constitutes such a justification. Petitioner first contends that *Miranda* warnings are unnecessary when a suspect is questioned about a misdemeanor traffic offense, because the police have no reason to subject such a suspect to the sort of interrogation that most troubled the Court in *Miranda*. We cannot agree that the dangers of police abuse are so slight in this context. For example, the offense of driving while intoxicated is increasingly regarded in many jurisdictions as a very serious matter.[17] Especially when the intoxicant at issue is a narcotic drug rather than alcohol, the police sometimes have difficulty obtaining evidence of this crime. Under such circumstances, the incentive for the police to try to induce the defendant to incrimi-

---

[15] Cf. *United States* v. *Robinson*, 414 U. S. 218, 221, n. 1 (1973); *id.*, at 238, n. 2 (POWELL, J., concurring) (discussing the problem of determining if a traffic arrest was used as a pretext to legitimate a warrantless search for narcotics).

[16] Cf. *New York* v. *Quarles*, 467 U. S., at 663–664 (O'CONNOR, J., concurring in judgment in part and dissenting in part).

[17] See Brief for State of Ohio as *Amicus Curiae* 18–21 (discussing the "National Epidemic Of Impaired Drivers" and the importance of stemming it); cf. *South Dakota* v. *Neville*, 459 U. S. 553, 558–559 (1983); *Perez* v. *Campbell*, 402 U. S. 637, 657, 672 (1971) (BLACKMUN, J., concurring in part and dissenting in part).

nate himself may well be substantial. Similar incentives are likely to be present when a person is arrested for a minor offense but the police suspect that a more serious crime may have been committed. See *supra,* at 431–432.

We do not suggest that there is any reason to think improper efforts were made in this case to induce respondent to make damaging admissions. More generally, we have no doubt that, in conducting most custodial interrogations of persons arrested for misdemeanor traffic offenses, the police behave responsibly and do not deliberately exert pressures upon the suspect to confess against his will. But the same might be said of custodial interrogations of persons arrested for felonies. The purposes of the safeguards prescribed by *Miranda* are to *ensure* that the police do not coerce or trick captive suspects into confessing,[18] to relieve the " 'inherently compelling pressures' " generated by the custodial setting itself, " 'which work to undermine the individual's will to resist,' "[19] and as much as possible to free courts from the task of scrutinizing individual cases to try to determine, after the fact, whether particular confessions were voluntary.[20] Those purposes are implicated as much by in-custody questioning of persons suspected of misdemeanors as they are by questioning of persons suspected of felonies.

---

[18] See *Rhode Island* v. *Innis,* 446 U. S. 291, 299, 301 (1980); *Miranda* v. *Arizona,* 384 U. S. 436, 445–458 (1966).

[19] *Minnesota* v. *Murphy,* 465 U. S. 420, 430 (1984) (quoting *Miranda* v. *Arizona, supra,* at 467); see *Estelle* v. *Smith,* 451 U. S. 454, 467 (1981); *United States* v. *Washington,* 431 U. S. 181, 187, n. 5 (1977).

[20] Cf. Developments in the Law—Confessions, 79 Harv. L. Rev. 935, 954–984 (1966) (describing the difficulties encountered by state and federal courts, during the period preceding the decision in *Miranda,* in trying to distinguish voluntary from involuntary confessions).

We do not suggest that compliance with *Miranda* conclusively establishes the voluntariness of a subsequent confession. But cases in which a defendant can make a colorable argument that a self-incriminating statement was "compelled" despite the fact that the law enforcement authorities adhered to the dictates of *Miranda* are rare.

Petitioner's second argument is that law enforcement would be more expeditious and effective in the absence of a requirement that persons arrested for traffic offenses be informed of their rights. Again, we are unpersuaded. The occasions on which the police arrest and then interrogate someone suspected only of a misdemeanor traffic offense are rare. The police are already well accustomed to giving *Miranda* warnings to persons taken into custody. Adherence to the principle that *all* suspects must be given such warnings will not significantly hamper the efforts of the police to investigate crimes.

We hold therefore that a person subjected to custodial interrogation is entitled to the benefit of the procedural safeguards enunciated in *Miranda*,[21] regardless of the nature or severity of the offense of which he is suspected or for which he was arrested.

The implication of this holding is that the Court of Appeals was correct in ruling that the statements made by respondent at the County Jail were inadmissible. There can be no question that respondent was "in custody" at least as of the moment he was formally placed under arrest and instructed to get into the police car. Because he was not informed of

---

[21] The parties urge us to answer two questions concerning the precise scope of the safeguards required in circumstances of the sort involved in this case. First, we are asked to consider what a State must do in order to demonstrate that a suspect who might have been under the influence of drugs or alcohol when subjected to custodial interrogation nevertheless understood and freely waived his constitutional rights. Second, it is suggested that we decide whether an indigent suspect has a right, under the Fifth Amendment, to have an attorney appointed to advise him regarding his responses to custodial interrogation when the alleged offense about which he is being questioned is sufficiently minor that he would not have a right, under the Sixth Amendment, to the assistance of appointed counsel at trial, see *Scott* v. *Illinois*, 440 U. S. 367 (1979). We prefer to defer resolution of such matters to a case in which law enforcement authorities have at least attempted to inform the suspect of rights to which he is indisputably entitled.

his constitutional rights at that juncture, respondent's subsequent admissions should not have been used against him.

## III

To assess the admissibility of the self-incriminating statements made by respondent prior to his formal arrest, we are obliged to address a second issue concerning the scope of our decision in *Miranda:* whether the roadside questioning of a motorist detained pursuant to a routine traffic stop should be considered "custodial interrogation." Respondent urges that it should,[22] on the ground that *Miranda* by its terms applies whenever "a person has been taken into custody *or otherwise deprived of his freedom of action in any significant way,*" 384 U. S., at 444 (emphasis added); see *id.,* at 467.[23]

---

[22] In his brief, respondent hesitates to embrace this proposition fully, advocating instead a more limited rule under which questioning of a suspect detained pursuant to a traffic stop would be deemed "custodial interrogation" if and only if the police officer had probable cause to arrest the motorist for a crime. See Brief for Respondent 39–40, 46. This ostensibly more modest proposal has little to recommend it. The threat to a citizen's Fifth Amendment rights that *Miranda* was designed to neutralize has little to do with the strength of an interrogating officer's suspicions. And, by requiring a policeman conversing with a motorist constantly to monitor the information available to him to determine when it becomes sufficient to establish probable cause, the rule proposed by respondent would be extremely difficult to administer. Accordingly, we confine our attention below to respondent's stronger argument: that all traffic stops are subject to the dictates of *Miranda.*

[23] It might be argued that, insofar as the Court of Appeals expressly held inadmissible only the statements made by respondent after his formal arrest, and respondent has not filed a cross-petition, respondent is disentitled at this juncture to assert that *Miranda* warnings must be given to a detained motorist who has not been arrested. See, *e. g., United States* v. *Reliable Transfer Co.,* 421 U. S. 397, 401, n. 2 (1975). However, three considerations, in combination, prompt us to consider the question highlighted by respondent. First, as indicated above, the Court of Appeals' judgment regarding the time at which *Miranda* became applicable is ambiguous; some of the court's statements cast doubt upon the admissibility

436

Petitioner contends that a holding that every detained motorist must be advised of his rights before being questioned would constitute an unwarranted extension of the *Miranda* doctrine.

It must be acknowledged at the outset that a traffic stop significantly curtails the "freedom of action" of the driver and the passengers, if any, of the detained vehicle. Under the law of most States, it is a crime either to ignore a policeman's signal to stop one's car or, once having stopped, to drive away without permission. *E. g.*, Ohio Rev. Code Ann. § 4511.02 (1982).[24] Certainly few motorists would feel free either to disobey a directive to pull over or to leave the scene of a traffic stop without being told they might do so.[25] Partly for these reasons, we have long acknowledged that "stopping an automobile and detaining its occupants constitute a 'sei-

of respondent's prearrest statements. See *supra*, at 425–426. Without undue strain, the position taken by respondent before this Court thus might be characterized as an argument in support of the judgment below, which respondent is entitled to make. Second, the relevance of *Miranda* to the questioning of a motorist detained pursuant to a traffic stop is an issue that plainly warrants our attention, and with regard to which the lower courts are in need of guidance. Third and perhaps most importantly, both parties have briefed and argued the question. Under these circumstances, we decline to interpret and apply strictly the rule that we will not address an argument advanced by a respondent that would enlarge his rights under a judgment, unless he has filed a cross-petition for certiorari.

[24] Examples of similar provisions in other States are: Ariz. Rev. Stat. Ann. §§ 28–622, 28–622.01 (1976 and Supp. 1983–1984); Cal. Veh. Code Ann. §§ 2800, 2800.1 (West Supp. 1984); Del. Code Ann., Tit. 21, § 4103 (1979); Fla. Stat. § 316.1935 (Supp. 1984); Ill. Rev. Stat., ch. 95½, ¶ 11–204 (1983); N. Y. Veh. & Traf. Law § 1102 (McKinney Supp. 1983–1984); Nev. Rev. Stat. § 484.348(1) (1983); 75 Pa. Cons. Stat. § 3733(a) (1977); Wash. Rev. Code § 46.61.020 (1983).

[25] Indeed, petitioner frankly admits that "[n]o reasonable person would feel that he was free to ignore the visible and audible signal of a traffic safety enforcement officer . . . . Moreover, it is nothing short of sophistic to state that a motorist ordered by a police officer to step out of his vehicle would reasonabl[y] or prudently believe that he was at liberty to ignore that command." Brief for Petitioner 16–17.

zure' within the meaning of [the Fourth] Amendmen[t], even though the purpose of the stop is limited and the resulting detention quite brief." *Delaware* v. *Prouse*, 440 U. S. 648, 653 (1979) (citations omitted).

However, we decline to accord talismanic power to the phrase in the *Miranda* opinion emphasized by respondent. Fidelity to the doctrine announced in *Miranda* requires that it be enforced strictly, but only in those types of situations in which the concerns that powered the decision are implicated. Thus, we must decide whether a traffic stop exerts upon a detained person pressures that sufficiently impair his free exercise of his privilege against self-incrimination to require that he be warned of his constitutional rights.

Two features of an ordinary traffic stop mitigate the danger that a person questioned will be induced "to speak where he would not otherwise do so freely," *Miranda* v. *Arizona*, 384 U. S., at 467. First, detention of a motorist pursuant to a traffic stop is presumptively temporary and brief. The vast majority of roadside detentions last only a few minutes. A motorist's expectations, when he sees a policeman's light flashing behind him, are that he will be obliged to spend a short period of time answering questions and waiting while the officer checks his license and registration, that he may then be given a citation, but that in the end he most likely will be allowed to continue on his way.[26] In this respect,

---

[26] State laws governing when a motorist detained pursuant to a traffic stop may or must be issued a citation instead of taken into custody vary significantly, see Y. Kamisar, W. LaFave, & J. Israel, Modern Criminal Procedure 402, n. a (5th ed. 1980), but no State requires that a detained motorist be arrested unless he is accused of a specified serious crime, refuses to promise to appear in court, or demands to be taken before a magistrate. For a representative sample of these provisions, see Ariz. Rev. Stat. Ann. §§ 28–1053, 28–1054 (1976); Ga. Code Ann. § 40–13–53 (Supp. 1983); Kan. Stat. Ann. §§ 8–2105, 8–2106 (1982); Nev. Rev. Stat. §§ 484.793, 484.795, 484.797, 484.799, 484.805 (1983); Ore. Rev. Stat. § 484.353 (1983); S. D. Codified Laws § 32–33–2 (Supp. 1983); Tex. Rev. Civ. Stat. Ann., Art. 6701d, §§ 147, 148 (Vernon 1977); Va. Code

questioning incident to an ordinary traffic stop is quite different from stationhouse interrogation, which frequently is prolonged, and in which the detainee often is aware that questioning will continue until he provides his interrogators the answers they seek. See *id.*, at 451.[27]

Second, circumstances associated with the typical traffic stop are not such that the motorist feels completely at the mercy of the police. To be sure, the aura of authority surrounding an armed, uniformed officer and the knowledge that the officer has some discretion in deciding whether to issue a citation, in combination, exert some pressure on the detainee to respond to questions. But other aspects of the situation substantially offset these forces. Perhaps most importantly, the typical traffic stop is public, at least to some degree. Passersby, on foot or in other cars, witness the interaction of officer and motorist. This exposure to public view both reduces the ability of an unscrupulous policeman to use illegitimate means to elicit self-incriminating statements and diminishes the motorist's fear that, if he does not cooperate, he will be subjected to abuse. The fact that the detained motorist typically is confronted by only one or at most two policemen further mutes his sense of vulnerability. In short, the atmo-

---

§ 46.1–178 (Supp. 1983). Cf. National Committee on Uniform Traffic Laws and Ordinances, Uniform Vehicle Code and Model Traffic Ordinance §§ 16–203—16–206 (Supp. 1979) (advocating mandatory release on citation of all drivers except those charged with specified offenses, those who fail to furnish satisfactory self-identification, and those as to whom the officer has "reasonable and probable grounds to believe . . . will disregard a written promise to appear in court").

[27] The brevity and spontaneity of an ordinary traffic stop also reduces the danger that the driver through subterfuge will be made to incriminate himself. One of the investigative techniques that *Miranda* was designed to guard against was the use by police of various kinds of trickery—such as "Mutt and Jeff" routines—to elicit confessions from suspects. See 384 U. S., at 448–455. A police officer who stops a suspect on the highway has little chance to develop or implement a plan of this sort. Cf. LaFave, "Street Encounters" and the Constitution: *Terry, Sibron, Peters,* and Beyond, 67 Mich. L. Rev. 39, 99 (1968).

sphere surrounding an ordinary traffic stop is substantially less "police dominated" than that surrounding the kinds of interrogation at issue in *Miranda* itself, see 384 U. S., at 445, 491–498, and in the subsequent cases in which we have applied *Miranda*.[28]

In both of these respects, the usual traffic stop is more analogous to a so-called *"Terry* stop," see *Terry* v. *Ohio*, 392 U. S. 1 (1968), than to a formal arrest.[29]  Under the Fourth Amendment, we have held, a policeman who lacks probable cause but whose "observations lead him reasonably to suspect" that a particular person has committed, is committing, or is about to commit a crime, may detain that person briefly[30] in order to "investigate the circumstances that provoke suspicion." *United States* v. *Brignoni-Ponce*, 422 U. S. 873, 881 (1975).  "[T]he stop and inquiry must be 'reasonably related in scope to the justification for their initiation.'" *Ibid.* (quoting *Terry* v. *Ohio, supra*, at 29.) Typically, this means that the officer may ask the detainee a moderate number of questions to determine his identity and to try to obtain information confirming or dispelling the officer's suspicions.  But the detainee is not obliged to respond.  And, unless the detainee's answers provide the officer with probable cause to arrest him,[31] he must then be

---

[28] See *Orozco* v. *Texas*, 394 U. S. 324, 325 (1969) (suspect arrested and questioned in his bedroom by four police officers); *Mathis* v. *United States*, 391 U. S. 1, 2–3 (1968) (defendant questioned by a Government agent while in jail).

[29] No more is implied by this analogy than that most traffic stops resemble, in duration and atmosphere, the kind of brief detention authorized in *Terry*.  We of course do not suggest that a traffic stop supported by probable cause may not exceed the bounds set by the Fourth Amendment on the scope of a *Terry* stop.

[30] Nothing in this opinion is intended to refine the constraints imposed by the Fourth Amendment on the duration of such detentions.  Cf. *Sharpe* v. *United States*, 712 F. 2d 65 (CA4 1983), cert. granted, 467 U. S. 1250 (1984).

[31] Cf. *Adams* v. *Williams*, 407 U. S. 143, 148 (1972).

440

released.[32]    The comparatively nonthreatening character of detentions of this sort explains the absence of any suggestion in our opinions that *Terry* stops are subject to the dictates of *Miranda*.    The similarly noncoercive aspect of ordinary traffic stops prompts us to hold that persons temporarily detained pursuant to such stops are not "in custody" for the purposes of *Miranda*.

Respondent contends that to "exempt" traffic stops from the coverage of *Miranda* will open the way to widespread abuse.    Policemen will simply delay formally arresting detained motorists, and will subject them to sustained and intimidating interrogation at the scene of their initial detention.    Cf. *State* v. *Roberti*, 293 Ore. 59, 95, 644 P. 2d 1104, 1125 (1982) (Linde, J., dissenting) (predicting the emergence of a rule that "a person has not been significantly deprived of freedom of action for *Miranda* purposes as long as he is in his own car, even if it is surrounded by several patrol cars and officers with drawn weapons"), withdrawn on rehearing, 293 Ore. 236, 646 P. 2d 1341 (1982), cert. pending, No. 82–315.    The net result, respondent contends, will be a serious threat to the rights that the *Miranda* doctrine is designed to protect.

We are confident that the state of affairs projected by respondent will not come to pass.    It is settled that the safeguards prescribed by *Miranda* become applicable as soon as a suspect's freedom of action is curtailed to a "degree associated with formal arrest."    *California* v. *Beheler*, 463 U. S. 1121, 1125 (1983) *(per curiam)*.    If a motorist who has been detained pursuant to a traffic stop thereafter is subjected to treatment that renders him "in custody" for practical purposes, he will be entitled to the full panoply of protections prescribed by *Miranda*.    See *Oregon* v. *Mathiason*, 429 U. S. 492, 495 (1977) *(per curiam)*.

---

[32] Cf. *Terry* v. *Ohio*, 392 U. S., at 34 (WHITE, J., concurring).

Admittedly, our adherence to the doctrine just recounted will mean that the police and lower courts will continue occasionally to have difficulty deciding exactly when a suspect has been taken into custody. Either a rule that *Miranda* applies to all traffic stops or a rule that a suspect need not be advised of his rights until he is formally placed under arrest would provide a clearer, more easily administered line. However, each of these two alternatives has drawbacks that make it unacceptable. The first would substantially impede the enforcement of the Nation's traffic laws—by compelling the police either to take the time to warn all detained motorists of their constitutional rights or to forgo use of self-incriminating statements made by those motorists—while doing little to protect citizens' Fifth Amendment rights.[33] The second would enable the police to circumvent the constraints on custodial interrogations established by *Miranda*.

Turning to the case before us, we find nothing in the record that indicates that respondent should have been given *Miranda* warnings at any point prior to the time Trooper Williams placed him under arrest. For the reasons indicated above, we reject the contention that the initial stop of respondent's car, by itself, rendered him "in custody." And respondent has failed to demonstrate that, at any time between the initial stop and the arrest, he was subjected to restraints comparable to those associated with a formal arrest. Only a short period of time elapsed between the stop and the arrest.[34] At no point during that interval was respondent

---

[33] Contrast the minor burdens on law enforcement and significant protection of citizens' rights effected by our holding that *Miranda* governs custodial interrogation of persons accused of misdemeanor traffic offenses. See *supra*, at 432–434.

[34] Cf. *Commonwealth* v. *Meyer*, 488 Pa., at 301, 307, 412 A. 2d, at 518–519, 522 (driver who was detained for over one-half hour, part of the time in a patrol car, held to have been in custody for the purposes of *Miranda* by the time he was questioned concerning the circumstances of an accident).

informed that his detention would not be temporary. Although Trooper Williams apparently decided as soon as respondent stepped out of his car that respondent would be taken into custody and charged with a traffic offense, Williams never communicated his intention to respondent. A policeman's unarticulated plan has no bearing on the question whether a suspect was "in custody" at a particular time; the only relevant inquiry is how a reasonable man in the suspect's position would have understood his situation.[35] Nor do other aspects of the interaction of Williams and respondent support the contention that respondent was exposed to "custodial interrogation" at the scene of the stop. From aught that appears in the stipulation of facts, a single police officer asked respondent a modest number of questions and requested him to perform a simple balancing test at a location visible to passing motorists.[36] Treatment of this sort cannot fairly be characterized as the functional equivalent of formal arrest.

We conclude, in short, that respondent was not taken into custody for the purposes of *Miranda* until Williams arrested him. Consequently, the statements respondent made prior to that point were admissible against him.

## IV

We are left with the question of the appropriate remedy. In his brief, petitioner contends that, if we agree with the

[35] Cf. *Beckwith* v. *United States*, 425 U. S. 341, 346–347 (1976) ("'It was the compulsive aspect of custodial interrogation, and not the strength or content of the government's suspicions at the time the questioning was conducted, which led the Court to impose the *Miranda* requirements with regard to custodial questioning'") (quoting *United States* v. *Caiello*, 420 F. 2d 471, 473 (CA2 1969)); *People* v. *P.*, 21 N. Y. 2d 1, 9–10, 233 N. E. 2d 255, 260 (1967) (an objective, reasonable-man test is appropriate because, unlike a subjective test, it "is not solely dependent either on the self-serving declarations of the police officers or the defendant nor does it place upon the police the burden of anticipating the frailties or idiosyncrasies of every person whom they question").

[36] Cf. *United States* v. *Schultz*, 442 F. Supp., at 180 (suspect who was stopped for erratic driving, subjected to persistent questioning in the

Court of Appeals that respondent's postarrest statements should have been suppressed but conclude that respondent's prearrest statements were admissible, we should reverse the Court of Appeals' judgment on the ground that the state trial court's erroneous refusal to exclude the postarrest admissions constituted "harmless error" within the meaning of *Chapman* v. *California*, 386 U. S. 18 (1967). Relying on *Milton* v. *Wainwright*, 407 U. S. 371 (1972), petitioner argues that the statements made by respondent at the police station "were merely recitations of what respondent had already admitted at the scene of the traffic arrest" and therefore were unnecessary to his conviction. Brief for Petitioner 25. We reject this proposed disposition of the case for three cumulative reasons.

First, the issue of harmless error was not presented to any of the Ohio courts, to the District Court, or to the Court of Appeals.[37] Though, when reviewing a judgment of a federal court, we have jurisdiction to consider an issue not raised below, see *Carlson* v. *Green*, 446 U. S. 14, 17, n. 2 (1980), we are generally reluctant to do so, *Adickes* v. *S. H. Kress & Co.*, 398 U. S. 144, 147, n. 2 (1970).[38]

Second, the admissions respondent made at the scene of the traffic stop and the statements he made at the police station were not identical. Most importantly, though respondent at the scene admitted having recently drunk beer and smoked marihuana, not until questioned at the station did he

squad car about drinking alcohol and smoking marihuana, and denied permission to contact his mother held to have been in custody for the purposes of *Miranda* by the time he confessed to possession of a sawed-off shotgun).

[37] Judge Wellford, dissenting in the Court of Appeals, did address the issue of harmless error, see n. 6, *supra*, but without the benefit of briefing by the parties. The majority of the panel of the Court of Appeals did not consider the question.

[38] Nor did petitioner mention harmless error in his petition to this Court. Absent unusual circumstances, cf. n. 23, *supra*, we are chary of considering issues not presented in petitions for certiorari. See this Court's Rule 21.1(a) ("Only the questions set forth in the petition or fairly included therein will be considered by the Court").

acknowledge being under the influence of intoxicants, an essential element of the crime for which he was convicted.[39] This fact assumes significance in view of the failure of the intoxilyzer test to discern any alcohol in his blood.

Third, the case arises in a procedural posture that makes the use of harmless-error analysis especially difficult.[40] This is not a case in which a defendant, after denial of a suppression motion, is given a full trial resulting in his conviction. Rather, after the trial court ruled that all of respondent's self-incriminating statements were admissible, respondent elected not to contest the prosecution's case against him, while preserving his objection to the denial of his pretrial motion.[41] As a result, respondent has not yet had an opportunity to try to impeach the State's evidence or to present evidence of his own. For example, respondent alleges that, at the time of his arrest, he had an injured back and a limp[42] and that those ailments accounted for his difficulty getting out of the car and performing the balancing test; because he pleaded "no contest," he never had a chance to make that argument to a jury. It is difficult enough, on the basis of a complete record of a trial and the parties' contentions regarding the relative importance of each portion of the evidence presented, to determine whether the erroneous admission of particular material affected the outcome. Without the benefit of such a record in this case, we decline to rule that

---

[39] This case is thus not comparable to *Milton* v. *Wainwright*, 407 U. S. 371 (1972), in which a confession presumed to be inadmissible contained no information not already provided by three admissible confessions. See *id.*, at 375–376.

[40] Because we do not rule that the trial court's error was harmless, we need not decide whether harmless-error analysis is even applicable to a case of this sort.

[41] Under Ohio law, respondent had a right to pursue such a course. See n. 2, *supra.*

[42] Indeed, respondent points out that he told Trooper Williams of these ailments at the time of his arrest, and their existence was duly noted in the Alcohol Influence Report. See App. 2.

the trial court's refusal to suppress respondent's postarrest statements "was harmless beyond a reasonable doubt." See *Chapman* v. *California*, 386 U. S., at 24.

Accordingly, the judgment of the Court of Appeals is

*Affirmed.*

JUSTICE STEVENS, concurring in part and concurring in the judgment.

The only question presented by the petition for certiorari reads as follows:

"Whether law enforcement officers must give '*Miranda* warnings' to individuals arrested for misdemeanor traffic offenses."

In Parts I, II, and IV of its opinion, the Court answers that question in the affirmative and explains why that answer requires that the judgment of the Court of Appeals be affirmed. Part III of the Court's opinion is written for the purpose of discussing the admissibility of statements made by respondent "prior to his formal arrest," see *ante*, at 435. That discussion is not necessary to the disposition of the case, nor necessary to answer the only question presented by the certiorari petition. Indeed, the Court of Appeals quite properly did not pass on the question answered in Part III since it was entirely unnecessary to the judgment in this case. It thus wisely followed the cardinal rule that a court should not pass on a constitutional question in advance of the necessity of deciding it. See, *e. g.*, *Ashwander* v. *TVA*, 297 U. S. 288, 346 (1936) (Brandeis, J., concurring).

Lamentably, this Court fails to follow the course of judicial restraint that we have set for the entire federal judiciary. In this case, it appears the reason for reaching out to decide a question not passed upon below and unnecessary to the judgment is that the answer to the question upon which we granted review is so clear under our settled precedents that the majority—its appetite for deciding constitutional ques-

tions only whetted—is driven to serve up a more delectable issue to satiate it. I had thought it clear, however, that no matter how interesting or potentially important a determination on a question of constitutional law may be, "broad considerations of the appropriate exercise of judicial power prevent such determinations unless actually compelled by the litigation before the Court." *Barr* v. *Matteo*, 355 U. S. 171, 172 (1957) *(per curiam)*. Indeed, this principle of restraint grows in importance the more problematic the constitutional issue is. See *New York* v. *Uplinger*, 467 U. S. 246, 251 (1984) (STEVENS, J., concurring).

Because I remain convinced that the Court should abjure the practice of reaching out to decide cases on the broadest grounds possible, *e. g.*, *United States* v. *Doe*, 465 U. S. 605, 619–620 (1984) (STEVENS, J., concurring in part and dissenting in part); *Grove City College* v. *Bell*, 465 U. S. 555, 579 (1984) (STEVENS, J., concurring in part and concurring in result); *Colorado* v. *Nunez*, 465 U. S. 324, 327–328 (1984) (STEVENS, J., concurring); *United States* v. *Gouveia*, 467 U. S. 180, 193 (1984) (STEVENS, J., concurring in judgment); *Firefighters* v. *Stotts*, 467 U. S. 561, 590–591 (1984) (STEVENS, J., concurring in judgment); see also, *University of California Regents* v. *Bakke*, 438 U. S. 265, 411–412 (1978) (STEVENS, J., concurring in judgment in part and dissenting in part); *Monell* v. *New York City Dept. of Social Services*, 436 U. S. 658, 714 (1978) (STEVENS, J., concurring in part); cf. *Snepp* v. *United States*, 444 U. S. 507, 524–525 (1980) (STEVENS, J., dissenting), I do not join Part III of the Court's opinion.