## A93A0319. WILSON v. THE STATE.
(432 SE2d 211)

MCMURRAY, Presiding Judge.

Via indictment, defendant was charged with murder, felony murder, armed robbery and burglary. The jury acquitted defendant on the murder, felony murder and armed robbery charges; it could not reach a unanimous decision on the burglary charge. The trial court declared a mistrial on the burglary charge and defendant was re-indicted and tried for burglary. Following a conviction on the burglary charge, defendant appeals. *Held*:

1. The testimony of an accomplice, coupled with defendant's

statements to the police, a deputy sheriff and a cellmate, were sufficient to enable any rational trier of fact to find defendant guilty of burglary beyond a reasonable doubt. *Jackson v. Virginia*, 443 U. S. 307 (99 SC 2781, 61 LE2d 560); *Murphy v. State*, 203 Ga. App. 152, 155 (4) (416 SE2d 376). See also *Thurston v. State*, 186 Ga. App. 881 (1) (368 SE2d 822).

2. Defendant voluntarily accompanied the police to the sheriff's office in Sevier County, Tennessee, where he was interviewed in connection with the burglary. The police officers were in plain clothes and they were not armed. Defendant was told he was not under arrest and he was not restrained. In a small room at the sheriff's office, the police asked defendant general questions about his background and they asked him what he knew about the burglary. Defendant began telling the officers what he had "heard." When it became apparent to the officers that defendant "knew too much about what was supposed to have been taken, where the house had been entered, and the gauge of shotgun that was actually used in the crime," they gave him *Miranda* warnings. See *Miranda v. Arizona*, 384 U. S. 436, 444 (86 SC 1602, 16 LE2d 694).

Defendant asserts the trial court erred in refusing to suppress his pre-*Miranda* statement. We disagree. The statement was made before defendant was taken into custody. "For Miranda to apply a person must be taken into custody or otherwise deprived of his freedom of action in any significant way. *Shy v. State*, 234 Ga. 816 (1) (218 SE2d 599) (1975); Miranda v. Arizona, [supra]. Miranda warnings are not required simply because questioning takes place in a building containing jail cells. *Woods v. State*, 242 Ga. 277, 280-281 (248 SE2d 612) (1978); Oregon v. Mathiason, 429 U. S. 492, 495 (97 SC 711, 50 LE2d 714) (1977). . . . [T]here is no indication that the defendant had been taken into custody or otherwise deprived of his freedom of action in any significant way by action of the officers when he made his first statement to the police. The defendant's statement was admissible as a statement made prior to any in-custody interrogation. *Davis v. State*, 242 Ga. 901 (5) (252 SE2d 443) (1979)." *Hardeman v. State*, 252 Ga. 286, 287 (1), 288 (313 SE2d 95).

*Judgment affirmed. Birdsong, P. J., Andrews and Johnson, JJ., concur. Pope, C. J., concurs specially. Beasley, P. J., Cooper, Blackburn, JJ., and Senior Appellate Judge John W. Sognier dissent.*

Pope, Chief Judge, concurring specially.

It is true, as noted in the dissenting opinion, that in determining whether a suspect was questioned in a custodial interrogation, so as to require that he be informed of his rights, the question is how a reasonable man in the suspect's position would have understood his situation. See *Berkemer v. McCarty*, 468 U. S. 420 (104 SC 3138, 82

LE2d 317) (1984). It has been settled, however, that in a setting of the type involved in the case at hand, the suspect is not in custody or otherwise deprived of freedom so as to require a warning pursuant to *Miranda v. Arizona*, 384 U. S. 436 (86 SC 1602, 16 LE2d 694) (1966). "[W]e have explicitly recognized that *Miranda* warnings are not required 'simply because the questioning takes place in the station house, or because the questioned person is one whom the police suspect.' [*Oregon v. Mathiason*, 429 U. S. 492, 495 (97 SC 711, 50 LE2d 714) (1977).]" *California v. Beheler*, 463 U. S. 1121, 1125 (103 SC 3517, 77 LE2d 1275) (1983).

BEASLEY, Presiding Judge, dissenting.

I respectfully dissent because the warnings required by *Miranda v. Arizona*, 384 U. S. 436 (86 SC 1602, 16 LE2d 694) (1966), were not timely given.

On review of a trial court's determination of voluntariness of incriminating statements, after a *Jackson-Denno* hearing relating to admissibility, the trial court's findings as to factual determinations and credibility are upheld unless clearly erroneous. *Crawford v. State*, 245 Ga. 89, 90 (2) (263 SE2d 131) (1980). In a *Jackson-Denno* hearing, the burden is on the State to show by the preponderance of evidence that defendant's statements were voluntary. *Hurt v. State*, 239 Ga. 665, 668 (2) (238 SE2d 542) (1977).

In *Miranda*, the Supreme Court held that "the prosecution may not use statements, whether exculpatory or inculpatory, stemming from custodial interrogation of the defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination. By custodial interrogation, we mean questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way." Id. 384 U. S. at 444. To this statement it added a footnote: "This is what we meant in *Escobedo* [*v. Illinois*, 378 U.S. 478 (84 SC 1758, 12 LE2d 977) (1964)] when we spoke of an investigation which had focused on an accused." Id. fn. 4.

"In custody" in the *Miranda* sense is broader than "under arrest." It includes circumstances where the person is "significantly deprived of his freedom of action," *California v. Beheler*, 463 U. S. 1121, 1123 (103 SC 3517, 77 LE2d 1275) (1983), that is, "where there has been such a restriction on a person's freedom as to render him 'in custody.'" *Oregon v. Mathiason*, 429 U. S. 492, 495 (97 SC 711, 50 LE2d 714) (1977), a "'restraint on freedom of movement' of the degree associated with a formal arrest." *Beheler*, supra at 1125. "It is settled that the safeguards prescribed by *Miranda* become applicable as soon as a suspect's freedom of action is curtailed to a 'degree associated with formal arrest.' *California v. Beheler*, 463 U. S. 1121, 1125

(1983) (*per curiam*)." *Berkemer v. McCarty*, 468 U. S. 420, 440 (104 SC 3138, 82 LE2d 317) (1984). "Custody" for *Miranda* purposes is not limited to that period after a suspect "is formally placed under arrest," for such a rule "would enable the police to circumvent the constraints on custodial interrogations established by *Miranda*." *Berkemer*, supra at 441.

The Second Circuit summarized what has evolved as the meaning of "custodial interrogation" for the purpose of the *Miranda* requirements: "The situations requiring that Miranda warnings be issued have generally been termed 'custodial interrogation(s).' *See Minnesota v. Murphy*, 465 U.S. 420, 429, 104 S.Ct. 1136, 1143, 79 L.Ed.2d 409 (1984). Custodial interrogation exists when a law enforcement official questions an individual and that questioning was (1) conducted in custodial settings that have inherently coercive pressures that tend to undermine the individual's will to resist and to compel him to speak, *Miranda*, 384 U.S. at 467, 86 S.Ct. at 1624 (the in custody requirement) and (2) when the inquiry is conducted by officers who are aware of the potentially incriminatory nature of the disclosures sought, *Garner v. United States*, 424 U.S. 648, 657, 96 S.Ct. 1178, 1183, 47 L.Ed.2d 370 (1976) (the investigative intent requirement). Only questioning that reflects a measure of compulsion above and beyond that inherent in custody itself constitutes interrogation the fruits of which may be received in evidence only after *Miranda* warnings have been given. *See United States v. Moody*, 649 F.2d 124, 127-28 (2d Cir. 1981). The questions asked must have been both likely to elicit an incriminating response and to produce psychological pressures that will subject the individual to the 'will' of his examiner. *See Rhode Island v. Innis*, 446 U.S. 291, 300-01, 100 S.Ct. 1682, 1689, 64 L.Ed.2d 297 (1980); *Miranda*, 384 U.S. at 457-58, 86 S.Ct. at 1618-19 (1966)." *United States v. Morales*, 834 F2d 35, 38 (2nd Cir. 1987).

Whether a person is "in custody" in the *Miranda* sense at a particular time depends on "how a reasonable [person] in the suspect's position would have understood his [or her] situation." *Berkemer*, supra at 442.

It is in this context that we must consider this case.

Defendant was first interviewed by Ballew, an investigator of the State, when a large number of employees at a fair near the scene of the crimes was interviewed soon after the incident. Thereafter, in the course of the investigation, Perez, a co-worker, described defendant as one of the three people (Perez was one) involved in the incident and said defendant came from Sevier County, Tennessee. The investigator remembered defendant as fitting the description and the place of residence. A photo lineup was shown to Perez, who selected defendant's photo. The investigators could not locate him at first but then received a call from the sheriff's department in Sevier County advising

that defendant was there. That sheriff had learned that the Gwinnett authorities were looking for defendant and arrested him at his mother's home on an outstanding probation violation warrant. One of the purposes of the arrest at that time was to assure that the sheriff's department would know where defendant was when the Gwinnett authorities came to talk with him.

Ballew spoke with defendant while he was in custody at the jail and asked if they could talk. Defendant asked if it was about the incident in Lawrenceville. Ballew responded affirmatively and said there was no arrest warrant for him. Defendant agreed to talk at his mother's house, where he lived, because he had no transportation to go elsewhere. Before Ballew and the two other law enforcement officers who accompanied him arrived the next morning, defendant was released on bond. They considered him to be "the prime suspect."

Ballew and an armed Sevier County deputy went in a marked patrol car to defendant's mother's home. He agreed to talk with them, was patted down, and was taken in the patrol car to an office in the sheriff's department eight or nine miles from home, arriving about 10:30 a.m.

Present during the interview were Ballew, another investigator from the district attorney's office, and a sheriff's investigator. All were in plain clothes. The room was about 10' x 10' or 12' x 12', had two desks, file cabinets, a window, and a door. Defendant was told that he had been implicated in a burglary in Lawrenceville but there was no arrest warrant for him and he was not under arrest. The investigators first obtained general personal background information about defendant for about 25 minutes to "set[ ] the mode and the tone of the interview [they] were getting ready to go into."

At about 11:15 a.m. they asked him if he knew or had heard anything about the incident on Moon Road at the Couch house. Defendant said he had heard about it at the fair. He denied being present but in response to questioning went into details such as the gauge of the gun found at the scene, what items were stolen, where and how the house had been entered, and the location of the wound on the victim's body. The investigators went over this several times with defendant. They showed him a picture of Perez, which he identified as "Bobby," a person who worked at the fair in the dime pitch for Doug Dance. They told him that Perez had been arrested and had implicated defendant in the burglary. A few minutes later defendant picked up the photo and said Perez did not do the shooting, Kenny Howard did it.[1] The investigators came to the conclusion that defendant knew too much not to have been there. They told him this and

---

[1] Howard was later convicted of the murder and sentenced to life imprisonment.

that they needed a written statement from him.

Then, which was about 12:10 p.m., one of the investigators advised defendant of his *Miranda* rights. Defendant, who had nine years of schooling and could read and write, signed a written *Miranda* waiver at 12:16 p.m. The investigator testified that this was not done sooner because there was no arrest warrant, they did not have enough information, he was a suspect, and he could leave the interview at any time. However, he was never told that he could leave, and he had no means to return home other than by walking or by police escort.

After the waiver, in response to questioning, defendant admitted that he was in the house with Kenny and Bobby. The investigators considered him to be under arrest at that point, and one of them left the room to telephone for an arrest warrant. A written statement was started, and defendant signed the first paragraph to the effect that the statement was being made voluntarily. Through questioning, defendant detailed the events of the crimes step by step, which the investigator made notes of and testified to at trial.

The interview was moved into the detective commander's office downstairs because the first office was needed for another purpose. This was about 1:45 p.m. The written statement was not completed and was not signed by defendant because when they arrived at the second office, defendant indicated he wanted to call an attorney for advice. The questioning ceased.

Defendant was unable to obtain private counsel, so the public defender came. He testified that defendant "looked like he had been hassled," was a "little bit nervous," "didn't exactly like being held there" and was "fairly slow" (mentally). He did not believe that defendant would have understood what "indictment" meant, and he explained to him what he was being charged with. The Sevier County deputy who went with Ballew to defendant's mother's house for him had been defendant's probation officer and testified that defendant was "slow-functioning educationally," had some "learning blocks," and could not read or write very well.

According to investigator Ballew, defendant was cooperative throughout the interview, and the investigators tried not to intimidate him but knew that if he was involved, they would find out. And that if he was not involved, they would discover that also.

In sum, the facts of this case are that before defendant was advised of his rights, there was a "prolonged station house interrogation" which was "police dominated" and the detained person's "freedom of action" was curtailed to "a degree associated with formal arrest," all of which are "coercive aspects" of the circumstances. Compare *Pennsylvania v. Bruder*, 488 U. S. 9, 10 (109 SC 205, 102 LE2d 172) (1988), where these decisive factors were absent. There is no doubt that defendant had been "significantly deprived of freedom of

action" when he made the statements and answered the questions which were aimed at and did lead him to the brink of confession. Only when he was standing on the precipice, surrounded by the knowledge that he had given so many details that he was doomed, and after the investigators concluded that he must have been present and implicated as Perez had accused, did the investigators advise him of his rights, including his right to be silent.

Before defendant was advised of his rights, he "was subjected to restraints comparable to those associated with a formal arrest." *Berkemer*, supra at 441. Among the restraints were that he had been brought to the sheriff's office although he preferred interview at home; he was unaware of any transportation back; he was questioned incommunicado for over an hour and a half in a small room cut off from the outside world, with three investigators, about an incident in which he had been implicated by a person who confessed; he was not told he could leave whenever he desired; he was subject to probation revocation due to arrest the day before for probation violation; and he was educated only to the ninth grade and was "slow."

The relevant inquiry is "how a reasonable man in the suspect's position would have understood his situation." *Berkemer*, supra at 442. A reasonable man in defendant's circumstances, considering everything, would have understood that he was "in custody or . . . deprived of his freedom of action in [a] significant way," *Miranda*, supra at 445, prior to the time his rights were given. It cannot be concluded that the interrogation environment did not create an atmosphere of intimidation subjugating defendant to the will of the examiners. See *Miranda*, supra at 457. Compare *Beheler*, supra, where defendant was the person who originally called the police to report the crime, talked to them on the scene, gave consent to search the yard for the gun, voluntarily accompanied the police to the station, was interviewed for less than 30 minutes and left without hindrance. Compare also *Mathiason*, supra, where defendant later admitted that his interview was voluntary.

It is clear that the detectives were interrogating defendant "for the purpose of obtaining evidence to establish [his] guilt of a crime," so that *Miranda* warnings had to be given. *Shy v. State*, 234 Ga. 816, 818 (I), 823 (218 SE2d 599) (1975). They had passed the point of mere investigation or inquiry aimed at determining the nature of the situation. As in *Brown v. Beto*, 468 F2d 1284, 1286 (5th Cir. 1972), "the focus of the investigation was clearly centered on" defendant. See also *Aldridge v. State*, 247 Ga. 142, 144-145 (2) (274 SE2d 525) (1981). "[T]he definition of interrogation can extend only to words or actions on the part of police officers that they *should have known* were reasonably likely to elicit an incriminating response." *Rhode Island v. Innis*, supra at 302. What occurred here was "sustained and

intimidating interrogation at the scene of [defendant's interrogation]." See *Berkemer*, supra at 440.

Since this occurred while defendant was under significant deprivation of his freedom of action, he was entitled first to be advised of his silence and counsel rights. *Shy*, supra at 819. Unlike *Hardeman v. State*, 252 Ga. 286 (313 SE2d 95) (1984), this case involves a suspect who was not warned before he was questioned at length and who was deprived of his freedom of action in a significant way. Unlike *Vaughn v. State*, 261 Ga. 686, 687 (2) (410 SE2d 108) (1991), this case does not involve a suspect who came to the station with his wife to make a statement and was permitted to leave afterwards; Vaughn was not "in custody" in the *Miranda* sense.

Defendant was not timely advised. His pre-*Miranda* elicited responses to questioning constituted indirect proof of involvement. These telltale statements, which predictably led to the conclusion reached by the investigators that he was in fact a participant in the crimes, were inadmissible. It inescapably follows as a matter of law that the confession which followed as a matter of fact was the product of the illegally obtained information and was tainted by it. The confession, too, is inadmissible evidence, because the appropriate safeguards were not timely afforded "to insure that the statements were truly the product of free choice." *Miranda*, supra at 457.

The *Miranda* requirements "reflect[ ] the concern that the compulsive or coercive aspects of a custodial situation will cause a suspect to confess or to make incriminating statements involuntarily, not knowing of the Fifth Amendment protection against required self-incrimination." *United States v. Roark*, 753 F2d 991, 992 (11th Cir. 1985). The State did not prove "an intentional relinquishment or abandonment of a known right or privilege." *Johnson v. Zerbst*, 304 U. S. 458, 464 (58 SC 1019, 82 LE 1461) (1938).

I am authorized to state that Judge Cooper, Judge Blackburn, and Senior Appellate Judge John W. Sognier join in this dissent.

DECIDED MAY 6, 1993 —
RECONSIDERATION DENIED JUNE 3, 1993

*Jeffrey R. Sliz*, for appellant.
*Daniel J. Porter, District Attorney, R. Keith Miles, Assistant District Attorney*, for appellee.