LEIGH M. CLARK, Retired Circuit Judge.
The appellant herein has been convicted in three separate cases tried jointly by the Circuit Court of Montgomery County, to which Court appellant had appealed from three judgments of conviction in the Municipal Court of the City of Montgomery. In one of the cases, defendant was charged with assault in the third degree; in another he was charged with obstruction of governmental operations; and in the third case he was charged with resisting arrest.
The transcript of the evidence in the Circuit Court of Montgomery County before a jury discloses that five witnesses testified on call of the City and six other witnesses testified on call of the defendant, including the defendant himself, as to what occurred at the time and place there was activity by defendant which constituted the basis for the charges against him. The testimony of the witnesses revealed a long unpleasant relationship between the defendant and members of the Montgomery Police Department.
Before any evidence was taken in the case, defendant asked the court, through his trial attorney, that he “be allowed to help defend himself,” as to which there was the following coloquy among the trial judge, defendant’s attorney, and the defendant:
“THE COURT: That’s no motion for cause. All right, motion for defendant to give opening statement in part. Now, are you — are you all moving he be allowed to help defend himself?
“MR. McGINNIS: We are moving that for opening statement or in any other time in the trial, with your permission—
“THE COURT: Either you are going to defend him or he requests for the court he defend himself. If that’s what he wants, you are there to help.
“MR. McGINNIS: Restricted to opening statement.
“THE COURT: If he is going to defend himself and he asks the court to allow him to do that, I’ll do that. And the court will still order you be there to assist him. How you handle the case, the trial, that’s up to you.
“MR. McGINNIS: If you were to do that, could I assist him in any manner including witnesses?
“THE COURT: Sure. You are there with him.
“MR. McGINNIS: If that’s what you want, tell the Court that you wish to do it, try the case yourself, with my assisting you.
*206 “THE DEFENDANT: I, sir — I wish to try the case myself.
“THE COURT: Do you know what you are doing? The Court has appointed Mr. McGinnis, who is one of the most competent lawyers in criminal matters in the City of Montgomery, has been practicing before me a long time. Tell me on what grounds you wish to defend yourself.
“THE DEFENDANT: Your Honor, the thing that has happened to me, there is no way for me to explain it all to Mr. McGinnis throughout the time that I have been with him. The things that are likely to be said in the courtroom, I think, I would be a better judge of whether....
“THE COURT: The jury is going to judge the facts. You have a right to counsel under the 5th Amendment of the Constitution. And the Court, in my opinion, has appointed the best young trial lawyer in criminal matters in the City of Montgomery.
“THE DEFENDANT: Yes, sir.
“THE COURT: You have a right to defend yourself if you know what you’re doing. But there are certain rules of evidence the Court has to follow in a trial.
“THE DEFENDANT: Yes.
“THE COURT: Everything you want to say may not be relevant to be said. So if you are going to defend yourself, I advise you to get familiar with the rules of criminal law, the evidentiary procedures, and the rules of the court, and if you feel you want to defend yourself, the Court will grant your motion but I keep Mr. McGinnis to assist you at all times.
“THE DEFENDANT: Yes, sir.”
A brief on behalf of the appellant has been submitted by two attorneys of the firm of attorneys that included a member thereof that represented defendant as here-inabove indicated on the trial of the case. Eight issues are presented in the brief of counsel for appellant, which we will now consider in the order of their presentation and under their respective captions set forth in appellant’s brief.
I.
“Whether the Circuit Court of Montgomery County lacked jurisdiction over all three cases because the judgments of the Municipal Court of the City of Montgomery were void for lack of properly verified affidavits.”
In support of this issue, counsel for appellant cites the following cases: Dison v. State, 469 So.2d 662 (Ala.1984); Gandy v. City of Birmingham, 478 So.2d 11 (Ala. Crim.App.1985); and Cherry v. State, 491 So.2d 1006 (Ala.Crim.App.1986). None of said cited cases is in point. Each held that the unverified Uniform Traffic Ticket and Complaint, referred to as “U.T.T.C.,” did not constitute compliance with the law to the effect that a judgment of conviction cannot be based upon an indictment or a complaint that has not been verified by the person making the complaint.
II.
This issue of counsel for appellant is thus captioned:
“The Circuit Court of Montgomery County lacked jurisdiction because the City of Montgomery failed to timely file a properly signed complaint with the Circuit Court of Montgomery County.”
In order to show precisely the contention of counsel for appellant as to this issue, we now quote from the brief of said counsel all that is stated with reference to it:
“The procedures by which appeals to circuit courts from judgments of municipal courts are perfected are set forth in Section 12-14-70, Code of Alabama, et seq. Section 12-14-70(a), Code of Alabama provides that ‘[a]ll appeals from judgments of municipal courts shall be to the circuit court of the circuit in which the violation occurred for trial de novo.’ Section 12-14-70(c), Code of Alabama provides that a ‘defendant may appeal in any case within fourteen days from the entry of judgment by filing notice of appeal and giving bond_’ Section 12-14-70(b) provides that ‘When an appeal has been taken the municipality shall file the notice and other documents in the court to which the appeal is taken within *207 15 days, failing which the municipality shall be deemed to have abandoned the prosecution, defendant shall stand discharged, and the bond shall be automatically terminated.’ (Emphasis added.)
“One of the essential documents which must be filed is a complaint. Section 12-22-13, Code of Alabama requires that the complaint be signed by the municipal prosecutor. Cf. Rule 15.1(b), Alabama Rules of Criminal Procedure. If a complaint is not so signed jurisdiction does not vest in the circuit court. Mays v. City of Prattville, 402 So.2d 1114 (Ala. Crim.App.1981).
“Here, Appellant had appealed his municipal court conviction on January 3, 1985. (R. 387, 388, 389). All of the complaints here under consideration bore the name of ‘O.H. Hale’ above the typed words ‘Attorney for the City of Montgomery.’ (R. 369, 370, 371). By the side of the name ‘O.H. Hale’ on each complaint appeared the initials ‘K.W.R.’ (R. 369, 370, 371). Obviously, O.H. Hale’s name was not signed by O.H. Hale but by someone with the initials K.W.R.
“The trial of the cases commenced on May 20, 1985. After a jury was empan-elled, Appellant moved the trial court to dismiss the cases for lack of timely compliance with Section 12-22-113, Code of Alabama and lack of jurisdiction. (R. 21-24). The prosecutor stated that he found it necessary to remand the complaints and signed them. (R. 26). Appellant did, not consent. (R. 26). In any event, it was too late. Section 12-14-70(d) clearly mandates that all documents be filed ‘within 15 days, failing which the municipality shall be deemed to have abandoned the prosecution, the defendant shall stand discharged, and the bond shall be automatically terminated.’ (Emphasis added).
“The City of Montgomery having failed to timely file properly signed complaints, the Circuit Court of Montgomery had no jurisdiction to hear the cases. It, therefore, erred in not granting Appellant’s motion to dismiss the cases on that ground.”
In response to Issue II, counsel for appel-lee, under the heading “THE COMPLAINTS WERE PROPERLY SIGNED BY THE MUNICIPAL PROSECUTOR” argues the following:
“The Complaints were signed by O.H. Hale, City Prosecutor, and filed in the Circuit Court of Montgomery County within the fifteen days required by statute. The initials K.W.R. beside Mr. Hale’s signature indicate, at most, that the prosecutor’s signature was affixed de facto by someone with the authority to do so. Either way the signature was correctly affixed de jure.
“Assistants routinely sign documents legally requiring the signature of public officials. To rule their authorized signatures invalid would criple government functions, requiring the Governor, elected officials, judges and clerks to do nothing but sign papers all day long. Such an absurd ruling is not required by the law.
“In any case, the Complaint was amended at trial and the actual signature of the City Attorney was affixed thereto. On the direct appeal from Municipal Court, the Circuit Court may allow the prosecution to amend even a defective Complaint over the objection of the defendant where no new or different offense is introduced. Mosely [Mosley] v. City of Auburn, 428 So.2d 165 (Ala.Cr.App. 1982).”
We are of the opinion that we should hold that this issue of appellant should be decided adversely to appellant by what was stated in the last paragraph of the opinion in Mosley v. City of Auburn, at 428 So.2d 167, as follows:
“It is well settled that, on an appeal from municipal court, the circuit court may allow the prosecution to amend a defective complaint over the objection of the defendant when no new or different offense is introduced. Tatum v. State, 66 Ala. 465, 467 (1880); Perry v. State, 78 Ala. 22, 24 (18084); Wilson v. State, 34 Ala.App. 219, 222, 39 So.2d 250, cert, denied, 251 Ala. 676, 39 So.2d 254 (1949); Melech v. State, 42 Ala.App. 465, 466, *208 168 So.2d 33 (1964). Here, the amendment only added matter which was contained in the original complaint in municipal court. This rule does not apply where an indictment is concerned. Hughes v. State, 213 Ala. 555, 105 So. 664 (1925); Tatum.”
We conclude that Issue II of appellant is not well taken.
III.
As to this issue, it is contended in brief of counsel for appellant that on the day of the commencement of the trial in the Circuit Court of Montgomery County, Alabama, the trial court violated Rule 15.-4(b) of the Alabama Rules of Criminal Procedure, which provides:
“If a defendant has been charged in separate indictments, informations, or complaints, the court on its own initiative or on motion of either party, may, not later than seven days prior to trial, order that the charges be tried together if the offenses could have been joined in a single indictment, information, or complaint. Proceedings thereafter shall be the same as if the prosecution initially had been under a single indictment, information or complaint. However, the court shall not order that the offense be tried together without first providing the defendant and the prosecutor an opportunity to be heard.”
In response to the argument of counsel for appellant as stated above, counsel for ap-pellee states:
“On the date of trial, May 20, 1985, the Defense stated: ‘We would also again object to having those trials consolidated.’ (R. p. 14). There is nothing in the record to indicate the date of consolidation and, thus, nothing for this Court to consider. Whether the consolidation occurred seven days prior to trial is something not preserved for appellate review. “Where the date of consolidation does not appear in the record, there is nothing for this Court to review. McHellen v. State, 351 So.2d 689 (Ala.Cr.App.1977). Appellate review is limited to those matters appearing on the record. Conner v. State, 382 So.2d 601 (Ala.Cr.App.1979). The Defendant’s subsequent objection on the date of trial was not sufficient to preserve the issue. Conner v. State, supra.”
Although there is a lack of clarity in the position of counsel for either party on appeal as to this issue, we are in agreement with counsel for appellee in what he stated in his brief as follows:
“On the date of trial, May 20, 1985, the Defense stated: ‘We would also again object to having these trials consolidated.’ (R. p. 14). There is nothing in the record to show the date of consolidation and, thus, nothing for this Court to consider. Whether the consolidation occurred seven days prior to trial is simply not preserved for appellate review.”
This issue raised by appellant is decided in favor of appellee.
IY.
The caption of this issue is as follows:
“CONTINUITY OF POSSESSION OF THE TAPE WAS NOT SUFFICIENTLY ESTABLISHED.”
The “tape” referred to in said caption of brief of counsel for appellant refers to the recording tape, which the testimony of witnesses for the City said that the appellant had on himself at police headquarters on the day of the incident made the basis of the prosecution and as to which the following occurred, as stated by Lt. Dennis Bo-dine of the Montgomery Police Department:
“A. I went to this holding area.
“Q. Okay. And did you have any conversation at that time with Don Robinson?
“A. I did.
“Q. What was he doing or saying at that time?
“A. Don was on the other side of the door and I did go through the door into the area where he was. He was obviously holding something under his shirt and he informed me that he had enough explosives to blow up the whole building.
*209 “Q. Okay. What did you say to him, if anything?
“A. We talked for, I guess, ten or fifteen minutes. I was trying to find out what he was mad about. He made mention of the fact that he would blow up the building on several occasions. He demanded to get into the jail, which I took as what he wanted to do was to get in the jail and take control of it.
“Q. Okay. Did he — were you the only officer that came up there at that time?
“A. I think there was some others around. I was the only one in the area where he was.
“Q. In the holding area?
“A. Right.
“Q. Did anyone else ever go in there?
“A. At one time Sergeant Martin came in there and tried to give Don some coffee.
“Q. Okay. Would he take the coffee?
“A. He would not.
“Q. From what he told you, did you think that he had explosives?
“A. I did. I knew he had something. I didn’t know what it was, but I had my doubts. I felt like it was something or he wouldn’t have been doing what he was doing.
[[Image here]]
“Q. Now, Lieutenant, what was finally done for you all to get Mr. Robinson to custody?
“A. A percussion grenade was thrown in the holding area.
“Q. Describe what one of those does.
“A. Percussion grenade, stun-grenade, there are several names for them — I am not that familiar with them; I have seen what they do.
“Q. Well, what do they do? You saw what this one did.
“A. It’s just a loud explosion and a flash and is supposed to stun a person to where you can subdue him. This one, it went — instead of landing in the middle of the room it went all the way up the wall., I personally felt like a lot of the blast—
“Q. Where did the blast go?
“A. The blast went up.
“Q. Okay. And what happened after that grenade went off?
“A. Immediately, when it was — after it went off, Sergeant Stan Ingram, who threw the grenade, was the first person to enter the area and grabbed Don and Don hit him twice before he had a chance to subdue him.
“Q. How did he hit him? What did he hit him with?
“A. With his fist.
“Q. Did you see him after he had hit him?
“A. I did.
“Q. After Ingram came in there, did you go in and help grab him?
“A. I along with several others went in and subdued him.
“Q. What did you find he had under his jacket or coat?
“A. It was a tape recorder.
“Q. Okay.
“A. A black tape recorder.
“Q. Have you since listened to the tape that was on that recorder?
“A. I have.
“Q. Listening to that tape, did it accurately depict what your conversations and what this defendant had stated there during the period of time that you all were talking with him up there?
“A. It does.
“Q. And you have listened to it all the way through?
“A. I have.
“Q. What does the tape end on?
“A. Just gets the beginning of the explosion.
“Q. Okay. And that’s when it stops?
“A. That’s when it stops.
“Q. Okay. Did someone with the Montgomery Police Department take that tape into custody of the police?
“A. Sergeant R.C. Martin recovered the tape from the floor.
“Q. Now, can you name some of the officers that were assisting in this?
“A. Let’s see. Myself, Sergeant Martin, Sergeant Moore — as time went on, more came in. Sergeant Ingram, Major Alford, the Mayor, Sergeant Gantt.
*210 “Q. Okay. Who was he demanding to speak to over there?
“A. He demanded to speak to the chief or the mayor.
“Q. Did someone call to get the chief or the mayor there?
“A. We did try to call the chief. He had already left the house.
“Q. Okay. Did they call and get the mayor down there?
“A. I don’t know. I can’t answer that. “Q. Okay. Did the mayor come down? “A. He did come.
“Q. Did he speak — did Don Robinson speak to the mayor; when he came down there did he talk to him?
“A. He spoke with the mayor, yes, sir.
“Q. Okay, is that reflected on the tape?
“A. It’s on the tape, yes.
“Q. All right. You say you designed and put this security system in?
“A. Right. I was charged with the responsibility of designing the system. I looked at several others to develop ours.
“Q. Did you design the system?
[[Image here]]
“A. I did.
“Q. What did you take into consideration in designing the security system for the police department?
“A. It was to put into, number 1, to control, the general public from walking through the building unattended or unexpected. It was designed to keep unwanted persons from coming in or planting any explosive devices or attempting to take any hostages. That’s the reason it was put in.”
The difference between the parties on appeal as to Issue IV is to be found in the captions of the issue in the briefs of counsel for the respective parties. In appellant’s brief, it is captioned, “Continuity of Possession of the Tape was not Sufficiently Established,” while in appellee’s brief, it is captioned, “There was no break in the chain of custody.”
The “tape” referred to by each of the attorneys on appeal was on a tape recorder, as to which counsel for appellant states in his brief the following:
“On December 19, 1984, Robinson again went to police headquarters at the Public Affairs Building (R. 249). He testified that he concealed a tape recorder on his person to 'get [those] people to lie on [the] tape.’ (R. 227, 245). Robinson testified that he had purchased a new blank tape at a Magic Market. (R. 227, 242). According to Robinson’s testimony he put the new blank tape into the recorder. (R. 227). Robinson testified that if the tape in the recorder were not a new tape, it was something he did not remember (R. 227). He said that he checked the tape on the recorder and that the only thing on it before he entered the Public Affairs Building was his voice. (R. 227). J.D. Rolling, the desk sergeant that day, testified that he saw Robinson enter and that he did not notice anything unusual about his mannerisms. (R. 213). Sergeant Rolling issued Robinson a badge or pass to go to the second floor. (R. 212, 213). P.A. Reynolds, a trainee in the Montgomery Police Department, greeted Robinson on the second floor. (R. 217). Robinson testified that when he reached the second floor, he saw Lieutenant Bodine down the hall. (R. 245). He testified: ‘When I saw Mr. Bodine with that smile on his face — he was looking at me — . I broke all to pieces and I said there is no way in the world I’ll ever get to talk to anybody.’ (R. 245). Robinson said that he thought he would get the attention of someone other than Lieutenant Bodine if he said he would blow up the building. (R. 270). According to P.A. Reynolds, Robinson said that he had enough explosives to blow up the whole building and blow up the whole block if he didn’t get any satisfaction and that he wanted to be put in a cell. (R. 216). At that point, P.A. Reynolds went to get Lieutenant Bodine. (R. 216). When Reynols went to get Bodine, he left Robinson unattended. (R. 217). Robinson testified that he was trying to get someone to talk to him and not to shut down the police department. (R. 249). “Lieutenant Bodine said that he was in charge of the scene and that he went to the door in the holding area where Robin *211 son was standing. (R. 54-55, 58). Lieutenant Bodine said he was trying to find out why Robinson was mad and that Robinson said he would blow up the building and demanded to get in the jail. (R. 55). Lieutenant Bodine said that R.C. Martin, a Sergeant with the Montgomery Police Department, came in and tried to give Robinson some coffee but that Robinson would not take it. (R. 55). Lieutenant Bodine testified that Robinson had something under his shirt and that he was not able to talk Robinson into giving up whatever he had and was not able to get it from him. (R. 57). Lieutenant Bodine said that he told Ricky Moore, another officer with the Montgomery Police Department, to call the downstairs desk sergeant and tell him to secure the building. (R. 58, 59). According to Lieutenant Bodine, Robinson demanded to speak with Chief Swindall or Mayor Folmar. (R. 62). Lieutenant Bo-dine said that they did not try to call Chief Swindall but that he had already left his house. (R. 62). Mayor Folmar did come to the scene. (R. 62, 92). May- or Folmar testified: ‘When I’m at the scene, I am in command.’ (R. 191). Mayor Folmar gave an order to use a stun grenade on Robinson. (R. 190,191). Stan Ingram a member of the Montgomery Police Department strike force team, facilitated Mayor Folmar’s order. (R. 168). According to Ingram, stun grenades are used as entry devices and set forth a loud explosion and flash. (R. 151). Ingram threw a stun grenade into the holding area where Robinson was standing. (R. 59-60). There was a loud explosion and a black flash as smoke filled the room. (R. 60, 67, 91). After the grenade exploded, policemen poured into the room. (R. 60, 61). Stan Ingram led the way. (R. 60). The explosion did not knock Robinson down. (R. 66). However, according to Bodine, Robinson was obviously shocked, and, according to Mayor Folmar, Robinson was dazed and stunned. (R. 144). Stan Ingram testified as follows:
“ ‘Once the grenade went off, we immediately made entry into the room. At this point, I was the first one through the door. My main concern was to try to grab the area of which Mr. Robinson supposedly had a device. And that’s what I did. That’s why I was struck twice in the face. I didn’t defend myself. I went straight for the area of the device and tried to secure that area.’ (R. 153).
“Ingram testified that he and approximately four other officers wrestled Robinson to the ground. (R. 155). Ingram claimed at trial that he attempted to put Robinson under arrest. (R. 155). However, Ingram, when asked about his part in actually ‘arresting’ Robinson merely said ‘The subduing of him.’ (R. 172). Moreover, Robinson testified that he was a little bit bruised on the face and cheeks but ‘that was about it.’ (R. 154). Ingram did not go to a doctor. (R. 157). Robinson testified that he thought the police were going to kill him. (R. -251). Sergeant Martin testified that Robinson was twisting, throwing his body around, and kicking. (R. 123). Robinson said that if Ingram were hit it was an accident. (R. 276).
“Lieutenant Bodine testified that Robinson ‘resisted arrest’ when he would not ‘allow himself to be subdued.’ (R. 89). Lieutenant Bodine’s testimony reflected that the facts supporting the resisting arrest charge were the same as the facts supporting the assault charge. (R. 89, 90). The details of the ‘affidavits’ in the assault and resisting arrest cases were identical in all respects, including typographical errors. (R. 374, 378). Ingram’s testimony indicated that in his attempts to execute the ‘affidavits’ in all of the cases he merely signed his name rather than make a sworn declaration. (R. 169). The details of the ‘affidavits’ in the assault case and the resisting arrest case were identical in all respects. (R. 374, 378).
“Sergeant Martin testified that he recovered the tape from the floor and turned it over to J.W. Barnes who was the case agent. (R. 110). Sergeant Martin said that the tape was in his possession from the time he got it until he turned it over *212 to Barnes. (R. 113). Bames testified that he did receive the tape from Martin, that he had had the tape in his custody until the morning of the trial to check it out and gave it to Sergeant Martin and that no one else had had access to the tape. (R. 113). However, Lieutenant Bodine said that he had had the tape in his possession in his office to make copies of it. (R. 93). But, Sergeant Martin said that he did not take the tape to Lieutenant Bodine’s office for him to copy. (R. 114).
“At the conclusion of the prosecution’s case-in-chief, Appellant made numerous motions: (a) to dismiss the lesser included charge or in the alternative to make the prosecution elect whether to proceed on the assault or resisting arrest charge; (b) to direct a verdict in each case for failure to prove a prima facie case; (c) to exclude the evidence; (d) to dismiss both the assault and resisting arrest charges; and (e) to dismiss either the resisting arrest charge for failure to inform Robinson he was under arrest. (R. 173-177). The Circuit Court of Montgomery County denied those motions. (R. 173-177).”
As to Issue IV, we determine it in favor of appellee, in accordance with what was held by this Court in Moulds v. State, 426 So.2d 942, 949 (Ala.Cr.App.1982) as follows:
“The admission of tape recordings into evidence is within the sound discretion of the trial judge. Bufford v. State, 382 So.2d 1162 (Ala.Cr.App.), cert. denied, 382 So.2d 1175 (Ala.1980), rev’d on other grounds, 399 So.2d 894 (Ala.Cr.App. 1981).”
V.
In the brief of counsel for appellant as to this issue, Issue V is thus captioned:
“THE CIRCUIT COURT OF MONTGOMERY COUNTY ERRED IN CHARGING THE JURY ON RECKLESS ASSAULT WHEN THE COMPLAINT AVERRED ONLY INTENTIONAL ASSAULT.”
In support of this contention, counsel for appellant quotes from Ex Parte Washington, 448 So.2d 404, 407 (Ala.1984), as follows:
“A defendant is constitutionally entitled to be informed of the nature and the cause of the accusation against him. U.S. Const. Amend. VI; Ala. Const, art. I, § 6. The function of the indictment is to inform the accused of the crime with which he is charged, so that he may prepare a defense if one is available. Ex parte Hightower, 443 So.2d 1272 (Ala. 1983); City of Montgomery v. Collins, 355 So.2d 1111 (Ala.1978). The person accused of a crime is required at least to answer only the specific charge contained in the indictment. Geeter v. State, 35 Ala.App. 207, 45 So.2d 167 (1950).”
Counsel for appellee responds as to Issue V by stating that “THE COMPLAINT DOES NOT SPECIFY AN INTENTIONAL ASSAULT” and argues as follows as to this contention:
“The Complaint here charged Robinson with the assault defined in § 13A-6-22(4), i.e., the ‘intent’ charged in the Complaint is the intent to prevent a police officer from performing a lawful duty. From the allegations of the Complaint, it appears that the actual injury may be caused either intentionally or recklessly or with criminal negligence; nothing in the Complaint indicates that Robinson was charged only with the intentional infliction of the injury, nor do the terms of §§ 13A-6-22(4) limit themselves to a specific intent to the exclusion of a negligent or reckless assault. The Court’s charge to the jury was a correct statement of the applicable principles of law. Trawick [Traywick] v. State, 378 So.2d 1196 (Ala.Cr.App.1979).
“Assault in Alabama has always been a crime susceptible to commission by intentional or reckless acts. McGee v. State, 4 Ala.App. 54, 58 So. 108 [1008] (1912). The Defendant certainly had notice that his assault, while intentional, could also have been caused by the reckless disregard for the safety of others.
“In any case, this matter was not preserved for appellate review as the De *213 fendant made no objection to the charge below. The Defendant’s comments during the City’s objection on pages 345-346 are not deemed as a proper objection. An objection to an oral charge must be specific and must clearly delineate the perceived defect. Davis v. State, 440 So.2d 119 [1119] (Ala.Cr.App.1983), cert, denied, [465 U.S. 1083] 104 S.Ct. 1452 [79 L.Ed.2d 770] (1983). Under Alabama law, any defect in the Court’s oral charge to the jury is waived unless timely and specific objection is made.”
We think the argument of appellee’s counsel as quoted above is a correct answer to that of counsel for appellant as to Issue Y, which we now decide adversely to appellant.
VI.
This issue is captioned in brief of counsel for appellant as follows:
“Whether Appellant’s conviction of both resisting arrest and assault in the third degree was violative of Section 15-3-8, Code of Alabama, and the double jeopardy provision of Article I, Section 9, of the Alabama Constitution of 1901 and the Fifth Amendment to the United States Constitution.”
Counsel for appellee responds to the caption in brief of counsel for appellant by the following caption:
“ASSAULT AND RESISTING ARREST ARE SEPARATE AND DISTINCT OFFENSES.”
We are persuaded by the contention of appellee that we should decide this issue in favor of appellee in order to be in accord with what this Court and the Alabama Supreme Court have previously decided, particularly as shown by the opinions of Judge Tyson and Justice Faulkner in the cases of Wright v. City of Montgomery, 477 So.2d 489 (Ala.Cr.App.1985), and Ex Parte Wright, ill So.2d 492 (Ala.1985), in which it was held that “prosecution and conviction for driving while under the influence of alcohol after defendant’s entry of guilty plea to lane violation charge arising out of the same facts did not violate double jeopardy protection.”
VII.
By Issue VII, counsel for appellant contends largely as follows:
“When there is no legal evidence from which the jury could, by fair inference, find the defendant guilty, a denial of a motion for a judgment of acquittal constitutes reversible error.”
Counsel for appellant argues as follows:
“The evidence shows a frightened, bewildered, and dazed Robinson who merely reacted to the onslaught of the Montgomery Police Department. The evidence does not support a conclusion that Robinson intended to resist arrest. In fact, the evidence indicates that he was not informed that he was under arrest or for that matter even arrested until after the affray was over.
“The evidence not supporting conclusions that Appellant intended to resist arrest or for that matter that he was even under arrest until after the affray, his motions for judgment of acquittal or for a new trial in the resisting arrest case should have been granted.”
The argument of counsel for appellee in his brief is in part as follows:
“When a police officer arrests a person during the actual commission of a public offense, he is not required to inform the Defendant of his authority or the cause of arrest, nor is a statement of intent to arrest required. Where a police officer charges a defendant who is armed with a bomb and threatening to explode it, he is attempting to effect an arrest. The subjective belief of the Defendant is not determinative of when the arrest is accomplished, Foy v. State, 387 So.2d 321 (Ala.Cr.App.1980). Nor is the testimony of the officer determinative of the issue. “When an officer constricts the defendant’s freedom of movement on the basis of probable cause to believe that he was engaged in criminal activity an arrest is accomplished. Foy v. State, supra.
“In McCants v. State, 459 So.2d 992 (Ala.Cr.App.1984), this Court held at a police officer’s testimony that he did not actually arrest the defendant but only *214 held him in jail was not determinative of whether an arrest occurred. ‘A policeman’s unarticulated plan has no bearing on the question of whether a suspect was in custody at a particular time; the only relevant inquiry is how a reasonable man in the suspect’s position would have understood his situation.’ Berkemer v. McCarty, [468] U.S. [420], 104 S.Ct. 3138, 3152, 82 L.Ed.2d 317 (1984). It cannot be realistically disputed that Robinson realized he was being arrested.”
In our opinion Issue VII should be decided adversely to appellant.
VIII.
Counsel for appellant captions this issue in his brief as follows:
“LACK OF EVIDENCE OF INTENT AND PHYSICAL INJURY WARRANTED THE GRANTING OF APPELLANT’S MOTIONS FOR JUDGMENTS OF ACQUITTAL AND NEW TRIAL IN THE ASSAULT CASE.”
Counsel for appellee replies as to this issue as follows:
“ ‘Physical injury’ is defined as ‘impairment of physical condition or substantial pain.’ Code of Alabama, 1975, §§ 13A-1-2(8), Robinson ‘cocked his arm’ and hit Sergeant Ingram twice in his face, causing bruising. Photographs of those injuries were examined by defense counsel and there is testimony that Sergeant Ingram’s face was red due to the bruises. (R. p. 158). Such evidence is proof of impairment and substantial pain.
“Physical injury is distinguished from ‘serious physical injury’ by statute. Code of Alabama, 1975, §§ 13A-l-2(9). There need be no serious or protracted disfigurement proved in an assault conviction.”
We decide Issue VIII adversely to appellant.
We conclude that all issues are decided adversely to appellant and the judgment of the trial court should be affirmed.
The foregoing opinion was prepared by Retired Circuit Judge LEIGH M. CLARK, serving as a judge of this Court under the provisions of § 6.10 of the Judicial Article (Constitutional Amendment No. 328); his opinion is hereby adopted as that of the Court.
AFFIRMED.
TYSON, TAYLOR, PATTERSON, and McMILLAN, JJ., concur.
BOWEN, P.J., concurs in result only, with opinion.