6

## CIRCUIT COURT OF FAIRFAX COUNTY

Commonwealth of Virginia

v.

Elizabeth B. Norman

### Case No. (Criminal) 82073

By Judge Robert W. Wooldridge, Jr.

### January 21, 1994

This matter comes before the Court on the motion of defendants Elizabeth and Edward Norman to suppress physical evidence seized under a search carried out in the defendants' home and to suppress statements made by defendant Elizabeth Norman. For the reasons set forth below, the defendants' motions to suppress are granted.

On July 7, 1993, at approximately 11:30 p.m., a team of fourteen police officers executed a search warrant at the Norman residence. All officers were dressed in black "swat-team" outfits and were wearing black hoods and bullet-vests. The team arrived at the Norman residence with one officer driving a vehicle, a few as passengers, and the balance walking behind the vehicle.

Originally, the officers planned to gain entry into the residence through a ruse. The ruse was abandoned, however, when the officers approaching the house saw two people looking out of a lower story window toward the police. These two people, the Normans' daughter and her boyfriend, came outside and were secured by the police. In addition, the officers saw a woman (who turned out to be Mrs. Norman) standing outside the entrance level on a deck. Mrs. Norman was also secured as the police approached the house. The information available to the police indicated that the home was occupied by two adults (Mr. and Mrs. Norman) and perhaps by their two children. As the police approached the house, dogs belonging to the Normans and chained in the yard began to bark. The presence of the chained dogs was also known to the police prior to the search.

In securing the Normans' daughter and boyfriend, and Mrs. Norman, the police yelled, "Police. Search Warrant." Abandoning the ruse, the officers ran up the wooden stairs to a porch leading to the front door of the house. Officer Klugh testified that the distance between the top stair and the front door was fifteen to eighteen feet. Officer Kitzerow testified that the distance was three to six feet. As the officers reached the porch, Mr. Norman opened the front door and stood in the doorway. There was no testimony as to what caused Mr. Norman to open the front door. The officers yelled to Mr. Norman, "Police. Search Warrant" as they were coming forward. The lead officer, Officer Kenyon, then pushed Mr. Norman aside, and the officers entered the house. The distance between Officer Kenyon and Mr. Norman when Officer Kenyon yelled "Police. Search Warrant" to Mr. Norman was three feet, or about one to two strides.

All four individuals were brought inside, secured with "flexi-cuffs" and told to sit on the couch while the police conducted a protective sweep of the house. Once that was done, the search warrant was read, the "flexi-cuffs" were removed, and all four occupants were told they were free to leave. The daughter's boyfriend in fact left the residence. Mr. Norman was asked to come back into the master bedroom, which he did. There he was read his Miranda rights. Mrs. Norman asked to use the bathroom, which was searched before she was allowed to go in alone. Mrs. Norman also asked if she could smoke a cigarette; the officer standing with her requested that she not smoke. The officers testified that none of the Normans would have been allowed to walk around the house. Rather, they were confined to the living room area. No Miranda rights were read to Mrs. Norman. Standing in or near the bedroom, Officer Kitzerow leaned out and asked Mrs. Norman if she knew where the marijuana was. Mrs. Norman replied that it was in the closet. Officer Kitzerow asked Mrs. Norman how much marijuana there was. She replied that there were four pounds.

Mr. and Mrs. Norman move to suppress the search on grounds that it violated the Fourth Amendment. Mrs. Norman further moves to suppress her statements on Fifth Amendment grounds.

The Court first considers the Normans' argument that the actions of the police violated the Fourth Amendment protection against unlawful searches and seizures. Specifically, they assert that the police failed to comply with the "knock and announce" requirement of the Fourth Amendment.

The Supreme Court first announced an exception to the "knock and announce" requirement in the execution of a search warrant in *Johnson v.*

*Commonwealth*, 213 Va. 102, 189 S.E.2d 678 (1982), *cert. denied*, 409 U.S. 1116 (1973). The Court held that since a Virginia statute relating to "no-knock" entries did not exist, the validity of a search must be judged according to its reasonableness within the meaning of the Fourth Amendment to the United States Constitution and Article 1, § 10, of the Virginia Constitution.

Subsequently, in *Heaton v. Commonwealth*, 215 Va. 137, 207 S.E.2d 829 (1974), the Court articulated the circumstances in which a "no-knock" entry would be considered reasonable for Fourth Amendment purposes:

> Generally, police officers, before resorting to forced entry into premises to be searched under warrant, must attempt to gain admittance peaceably by announcing their presence, identifying themselves as police officers, and stating their purpose. Exceptions to the rule, however, permit officers to make an unannounced entry where they have probable cause to believe that their peril would be increased if they announce their presence or that an unannounced entry is necessary to prevent persons within from escaping or destroying evidence. Unless an exception can be established by the prosecution, evidence seized after a "no-knock" entry is excluded under the Fourth Amendment.

*Id.* at 138, 207 S.E.2d at 830 (citations omitted).

The "knock and announce" doctrine "therefore, requires that the police, prior to forcing entry into a dwelling: (1) knock; (2) identify themselves as police officers; (3) indicate the reason for their presence; and (4) wait a reasonable period of time for the occupants to answer the door." *Gladden v. Commonwealth*, 11 Va. App. 595, 598 (1991). (Emphasis added.)

The facts of this case do not fall squarely within the "knock and announce" doctrine. There was no "knock." Indeed, there proved to be no need for one. The officers did identify themselves as police officers and indicated the reason for their presence. It was not a question of "waiting a reasonable period of time for the occupants to answer the door," as the door was opened by Mr. Norman just as they approached it.

But the purpose of the "knock and announce doctrine" is to protect both the police and the residence dwellers. It is to enhance the safety of the officers approaching the house and to notify a reasonable dweller that his right to resist the seeming aggression on his private property has both a legal basis and an official purpose. As with "knock and announce" cases,

there can be no magic formula for that. Like all searches, the validity of this search must be judged according to its reasonableness within the meaning of the Fourth Amendment.

Here, the Court finds that the police moved Mr. Norman out of the doorway before announcing their identity and purpose in such a manner as would reasonably inform him of their identity and purpose and allow him to respond. It is unknown why Mr. Norman appeared in the doorway. He may have heard the commotion generated by the approach of the police. He may just as easily have been stepping out onto his porch for a conversation with his wife. When he opened his front door, and the police yelled, "Police. Search Warrant," they were but three feet away and moving toward him. Their group consisted of nearly a dozen officers dressed in black swat-team outfits and wearing black hoods. The area around the doorway was not illuminated, and it was nearly midnight. Mr. Norman was immediately moved aside physically (although there was no testimony that it was done in an injurious way). The totality of the circumstances surrounding the actual entry were not such as to inform Mr. Norman that there was a legal basis and official purpose to the entry, as opposed to one he should counter with force. The timing of the officers' rush of the doorway in relation to Mr. Norman's appearing in it gave him no opportunity to attempt to close the door. *See Meyers v. Commonwealth*, 12 Va. App. 398, 402 (1991). Moving Mr. Norman aside improperly constituted force (albeit non-injurious) in gaining entry without that opportunity to respond. *See Meyers*, 12 Va. App. at 402.

There were also no exceptions present to the requirement of announced entry. There was no testimony that the officers had probable cause to believe their peril would be increased by an announced entry. The police knew of the presence of the dogs. As long as the dogs were chained, they posed no safety problem. The police were informed that the residence was inhabited by two adults and potentially two teenage daughters. They encountered (including Mr. Norman) both of the adults and one of the daughters (with Mrs. Norman and the one daughter secured on the outside of the house). There was also no evidence that an unannounced entry was needed to prevent persons from escaping or destroying evidence.

The motion to suppress the search having been granted on Fourth Amendment grounds, the statements made by Mrs. Norman during the execution of the warrant are also suppressed as the poisonous fruit of that search.

October 14, 1994

This matter comes before the Court on the Motion of the Defendant to Suppress Statements made by her on July 7, 1993, during and following a search of her home on the grounds that the statements were made without the benefit of *Miranda* warnings and violated her Fifth Amendment rights under the United States Constitution. For the reasons stated below, the defendant's motion is denied.

The Court adopts the facts contained in its January 21, 1994, letter, with one addition. That letter reflects that when the Normans, their daughter, and her boyfriend were told that they were free to leave, the boyfriend in fact left the residence. It should be added that the daughter also left the interior of the residence and went outside to a back deck or the backyard while the search took place.

The issue before the Court is whether the questions that Norman answered were asked by the police officers after she had been taken into custody or otherwise deprived of her freedom of action in any significant way. *Miranda v. Arizona*, 384 U.S. 436, 444 (1966). Circumstances depriving one of the freedom to leave or freedom of action result in a custodial setting for *Miranda* purposes. *Miranda*, 384 U.S. at 327. In deciding whether such freedom has been deprived, one must view the totality of the circumstances from the vantage point of how a reasonable person in Norman's position would have perceived her situation. *Wass v. Commonwealth*, 5 Va. App. 27 (1987), citing *Berkemer v. McCarty*, 468 U.S. 420, 442 (1984). *Wass* provides a lengthy (although not exhaustive) list of factors to be considered in determining that totality of the circumstances. Indeed, the case before the Court is remarkably similar to *Wass*. Essentially, the issue before the Court is whether, like in *Wass*, the statements and actions of the police and the protective measures employed for the safety and security of the officers gave rise to a custodial situation for *Miranda* purposes? Or instead, was Norman's freedom of movement not restricted to a degree associated with a formal arrest, *Wass* can be distinguished, and the procedural safeguards afforded by *Miranda* were not triggered?

A litany of similarities to and differences from *Wass* exists in this case. The Court has considered these similarities and differences and viewed the circumstances of this case as a totality, with an eye toward the principles and admonitions provided in *Wass*. However, the Court focuses its opinion on what it finds to be the most significant differences from *Wass*. In Norman's favor, she was actually "flexi-cuffed" at a point earlier in the eve-

ning. Although the flexi-cuffs were removed and she (and the other three occupants) were then told that they were free to go, Norman clearly was not free to leave at the time she was flexi-cuffed. The police acknowledge that limitation, adding that it was for the purpose of enabling them to secure the area, not to accomplish an arrest. But there can be no doubt that at the time she was "flexi-cuffed," Norman was placed in a custodial situation giving rise to *Miranda* protection. Indeed, this Court remains gravely concerned that anyone in such a situation could soon thereafter reasonably believe that she is free to leave. One must ask whether the flexi-cuffs, and the combination of all that went before them, precluded the return to a non-custodial perspective.

That leads to the question posed by *Miranda*, its progeny, and by *Wass*: would a reasonable person in Norman's position, under all the circumstances, have felt that she was free to leave the premises when told by the police that she was to do so? In answering that question in the affirmative, the Court focuses on Norman's daughter's boyfriend, who did leave the premises when informed that he could do so, and Norman's daughter, who did go outside to the back deck or the backyard when told that she could leave. It may indeed have been impractical for Norman to leave, since she would be leaving her own home. But there was no testimony as to how practical it was for Norman to leave (i.e., whether she could have conveniently walked to a neighbor's home on a late summer evening). Clearly, she could have stepped outside like her daughter or left entirely like the boyfriend. The issue is not so much whether it was practical for her to do so as whether she reasonably should have felt free to do so under the circumstances. The Court finds that she should have. Unlike in *Wass*, there was no testimony that Norman did not feel free to leave once told she could do so. Unlike in *Wass*, she was not told that despite being free to leave, the police like to have the owner present while searching a house.

As a reasonable person would have felt free to leave, Norman was not subjected to custodial interrogation and was not entitled to *Miranda* protection. The defendant's motion to suppress was therefore denied.