OPINION
Defendant, Toure Lewis, appeals from his conviction and sentence for involuntary manslaughter.
On July 1, 1998, Trotwood police were dispatched to 4027 Annapolis Avenue, Trotwood, on a report that an infant was not breathing. Upon arrival police discovered that both the child's mother, Carla Davis, and the child's father, Toure Lewis, were at home with the child. The two month old infant, Cassius Lewis, was not breathing and his lips were purple.
Medics were summoned and the child was taken to Good Samaritan Hospital. Doctors at Good Samaritan Hospital advised police that the child's injuries were not accidental. The child was transferred to Children's Medical Center. Doctors there confirmed for police that the injuries to the child were not accidental and were consistent with "shaken baby syndrome."
At the hospital police questioned Carla Davis, Toure Lewis, and Rosetta Byrd, the maternal grandmother. This took place in a "quiet room," a small room just off the intensive care unit where the child was being treated. Police told Lewis that the child's injuries were not accidental. Lewis then told police that the child had cried a lot during the night and he was cradling and rocking the child in his arms, and he rocked harder and harder until the child stopped crying, and that he got too violent. After making that oral statement Lewis agreed to give police a written statement, following which he was arrested for child endangerment. On July 3, 1998, the child died as a result of his injuries. The Montgomery County Coroner ruled that the cause of death was shaken baby syndrome.
Toure Lewis was indicted on one count of Involuntary Manslaughter, R.C. 2903.04(A). The underlying felony offense was child endangerment resulting in serious physical harm. R.C. 2919.22(B)(1). Prior to trial Lewis filed a motion to suppress the statements he made to police. Lewis argued that his statements were inadmissible because police did not inform him of his Miranda rights before questioning him at the hospital. The trial court overruled Lewis' motion to suppress his statements, concluding that the police interview of Lewis at the hospital was not custodial interrogation which required Miranda warnings.
Prior to the commencement of Lewis' trial the child's mother, Carla Davis, died. Lewis subsequently attempted to introduce at trial statements made by Carla Davis to Lewis' defense counsel. The trial court refused to admit that evidence. The jury found Lewis guilty of involuntary manslaughter and the trial court sentenced him to four years imprisonment.
From his conviction and sentence Lewis has timely appealed to this court.
 FIRST ASSIGNMENT OF ERROR THE TRIAL COURT ERRED BY NOT SUSTAINING DEFENDANT'S MOTION TO SUPPRESS DEFENDANT'S STATEMENT.
Lewis argues that the trial court erred in failing to find that the police interview of him conducted at Childrens' Medical Center was custodial interrogation requiring Miranda warnings. After reviewing the evidence and applicable law, we agree with the trial court that Miranda
warnings were not required.
The testimony presented at the suppression hearing indicates that on July 1, 1998, police officers and medics were dispatched to 4027 Annapolis Drive, Trotwood, on a report that a baby was not breathing. Upon arrival police discovered both the mother, Carla Davis, and the father, Toure Lewis, at home with their two month old son, Cassius Lewis. Medics transported the child to Good Samaritan Hospital. Trotwood police officer Sgt. Carl Bush gave Toure Lewis a ride to the hospital while Carla Davis rode in the ambulance with her son.
At the hospital, Sgt. Bush spoke with Carla Davis and Toure Lewis in order to obtain medical information about the child. Sgt. Bush then left the hospital but was contacted by hospital personnel and asked to return. When Bush returned to Good Samaritan Hospital, Dr. Grove informed him that there were suspicious circumstances surrounding the child's injuries, which appeared to be non-accidental. Meanwhile, the child was transferred to Children's Medical Center for treatment.
At Children's Medical Center Sgt. Bush spoke with Dr. Rowin who confirmed that the child's injuries were not accidental and were consistent with "shaken baby syndrome." Sgt. Bush then spoke separately with each of the three family members present, Carla Davis, Toure Lewis and Rosetta Byrd, the maternal grandmother, in order to ascertain what might have happened. Although Sgt. Bush was aware that a crime might have been committed, he had no suspects at this time.
The interviews took place in a "quiet room," a small room just off the intensive care unit where the child was being treated. That room is ten feet by twelve feet, and contains a couch, table, two or three chairs, a lamp, paintings on the wall, and a telephone. During the initial interviews of the three family members, Sgt. Bush learned that Carla Davis, Toure Lewis and Rosetta Byrd were all in the house with the child before the child was injured. Sgt. Bush did not reveal to the family members what he knew about the non-accidental nature of the child's injuries. At the conclusion of these interviews, Sgt. Bush still did not have a suspect and he decided to interview each of the family members a second time.
At that point Lewis was busy providing medical information to the hospital staff. Sgt. Bush asked Lewis if he would join him in the quiet room, after he finished speaking with hospital personnel, so Bush could speak with him again. After Lewis finished talking with the hospital staff, he went to the quiet room and joined Sgt. Bush, Det. Derringer and Det. Culbertson.
Sgt. Bush informed Lewis that he was free to leave at anytime, that he was not under arrest, and that he could get up and go see the child, get food, or just walk out if he wanted. At the start of this second interview, Sgt. Bush told Lewis that the medical staff had determined that the child's injuries were not accidental. Lewis was then asked about his contact with the child just before the child's injuries, and if he knew what had happened to the child. At that point Lewis looked down at the floor and began shaking and crying. Lewis talked about the fact that he was taking anger management classes. Lewis stated that when he is in his van with the child and the child starts crying, Lewis first hits the brake and then hits the gas, creating a rocking motion that the child likes. Det. Culbertson told Lewis that he did not think that is what caused the child's injuries.
Police then began asking Lewis if it was hard taking care of a child. Lewis said that it was hard, and stated that the child had cried a lot during the night. Lewis said he got up with the child and cradled him in his arms and began rocking him real hard back and forth, and he got too violent. After Lewis made that oral statement, Sgt. Bush asked him if he would write out a statement. Lewis agreed to do that. While Lewis was writing his statement, Sgt. Bush and Det. Culbertson left the room, leaving only Det. Derringer with Lewis. During this time Lewis made two phone calls from the quiet room. After completing his written statement, Lewis was arrested for child endangerment and transported to the police station.
Lewis fell asleep in the police cruiser on the way to the police station. During the booking process, at a time when police were asking Lewis for only identifying information such as his name, address, telephone number, etc., Lewis stated: I didn't mean it, I just wanted him to stop.
In State v. Biros (1997), 78 Ohio St.3d 426, 440, the Ohio Supreme Court stated:
 Police are not required to administer Miranda warnings to everyone whom they question. Oregon v. Mathiason
(1977), 429 U.S. 492, 495, 97 S.Ct. 711, 714, 50 L.Ed.2d 714, 719. "Nor is the requirement of warnings to be imposed simply because the questioning takes place in the station house, or because the questioned person is one whom the police suspect." Id. Only custodial interrogation triggers the need for Miranda
warnings. Id. at 494, 97 S.Ct. at 713, 50 L.Ed.2d at 719. See, also, Berkemer v. McCarty (1984), 468 U.S. 420, 440-442, 104 S.Ct. 3138, 3150-3152, 82 L.Ed.2d 317, 335-336. The determination whether a custodial interrogation has occurred requires an inquiry into "how a reasonable man in the suspect's position would have understood his situation." Berkemer at 442, 104 S.Ct. at 3151, 82 L.Ed.2d at 336. "[T]he ultimate inquiry is simply whether there is a `formal arrest or restraint on freedom of movement' of the degree associated with a formal arrest." California v. Beheler (1983), 463 U.S. 1121, 1125, 103 S.Ct. 3517, 3520, 77 L.Ed.2d 1275, 1279. See, also, State v. Barnes (1986), 25 Ohio St.3d 203, 207, 25 OBR 266, 270, 495 N.E.2d 922, 925.
In deciding whether Lewis was in custody when police interviewed him at the hospital, and thus whether Miranda warnings were required before any questioning, neither the police officers' subjective intent nor Lewis' subjective belief is relevant to the inquiry. State v. Hopfer (1996),112 Ohio App.3d 521. Thus, whether Lewis subjectively felt free to get up and leave and whether the police officers subjectively considered their interaction with Lewis an interview rather than an interrogation is irrelevant. The relevant inquiry is how a reasonable person in Lewis' situation would have understood the situation. State v. Estepp (November 26, 1997), Montgomery App. No. 16279, unreported.
In Estepp, a case factually similar to this one, this court set forth a list of factors to be considered in assessing how a reasonable person in defendant's situation would have understood that situation:
 1) What was the location where the questioning took place-i.e., was the defendant comfortable and in a place a person would normally feel free to leave? For example, the defendant might be at home as opposed to being in the more restrictive environment of a police station;
 2) Was the defendant a suspect at the time the interview began (bearing in mind that Miranda warnings are not required simply because the investigation has focused);
 3) Was the defendant's freedom to leave restricted in any way;
 4) Was the defendant handcuffed or told he was under arrest;
5) Were threats made during the interrogation;
 6) Was the defendant physically intimidated during the interrogation;
7) Did the police verbally dominate the interrogation;
 8) What was the defendant's purpose for being at the place where questioning took place? For example, the defendant might be at a hospital for treatment instead of being brought to the location for questioning;
 9) Were neutral parties present at any point during the questioning;
 10) Did police take any action to overpower, trick, or coerce the defendant into making a statement.
Applying the above factors to this case, we conclude that a reasonable person in Lewis' position would have understood that his freedom of movement was not being restrained to a degree associated with a formal arrest. The location of this interview was in a place an individual would normally feel free to leave, a hospital as opposed to a police station. Estepp, supra. According to Sgt. Bush, Lewis was not a suspect when the interview began. He was one of at least three people who were with the child before the child was injured. Lewis did not become a suspect until after he made his oral incriminating statement. As we noted earlier, even if the police investigation had focused on Lewis before the interview began, that fact alone would not have requiredMiranda warnings.
There is no evidence in this case that anyone took any steps to restrict Lewis' freedom of movement before his incriminating statements were made. Lewis was not handcuffed, and was specifically told by Sgt. Bush that he was not under arrest and was free to get up and leave at anytime. Lewis was not arrested until after he completed his written statement. There is also no evidence that any threats or promises were made to Lewis during the interrogation, and no evidence that Lewis was intimidated physically or in any other way by the three police officers who were present in the room with him. Contrast: State v. Brown (1993),91 Ohio App.3d 427.
With respect to whether police verbally dominated the interrogation, while Sgt. Bush took the lead role in the questioning, this is natural under the circumstances and not a significant factor. Estepp, supra. Moreover, some of Lewis' incriminating responses were the result of his own narration and not express questioning by the police. Lewis was not at the hospital for the purpose of being questioned by police, but rather to seek treatment for his injured son. While no neutral parties were present in the room during the interrogation, there is no evidence that police tricked or coerced Lewis into making a statement.
We conclude that a reasonable person in Lewis' position would not have felt that his freedom was being restrained to the extent associated with a formal arrest. Therefore, Lewis was not in custody and Miranda
warnings were not required before police questioned him. Estepp, supra;Biros, supra.
Analyzing his oral and written statements separately, Lewis argues, however, that after he made his oral incriminating statement to police at the hospital, a reasonable person in his position would not have thereafter felt free to get up and leave. Lewis reasons that once he made his oral incriminating statement, he was immediately thereafter in custody and police should have advised him of his Miranda rights before eliciting his written statement which was given after his oral statement.
In State v. Singleton (March 31, 1999), Montgomery App. Nos. 17003, 17004, unreported, this court held that once Defendant Singleton orally confessed at the police station to having committed aggravated murder, a reasonable person in Singleton's situation would not have thought he was at liberty to walk away from the police station, even though Singleton was not immediately placed under arrest, told that he was under arrest, or told that he was not free to leave. We concluded that police should have given Miranda warnings to Singleton before asking him any further questions, and that the trial court should have suppressed anyunmirandized statements that followed Singleton's oral confession.
We did not hold in Singleton, however, that a defendant who orally confesses to a crime is necessarily in custody immediately thereafter. We limited our decision to the particular facts, which included the crime confessed to and the location of the confession. We agree with the trial court in this case that Singleton is distinguishable on its facts.
In Singleton the defendant explicitly confessed at the police station to being the triggerman in an aggravated murder. Lewis' oral statement, on the other hand, was made at the hospital at a time when his son was still alive and being treated for his injuries. Moreover, while Lewis admitted in his oral statement that he was rocking the child in his arms and he "got too violent," he did not explicitly state that he shook the infant or that he caused the child's injuries. Lewis' admission resulted in police arresting him for child endangerment, not aggravated murder. Given the nature of Lewis' oral statement and all of the surrounding facts and circumstances, we do not believe that a reasonable person in that situation would necessarily conclude that he was immediately thereafter in police custody.
Even assuming arguendo that Lewis was in custody immediately after giving his oral statement, and that police should have, but did not, advise Lewis of his Miranda rights before eliciting his written statement, admission of that written statement is nevertheless harmless error beyond a reasonable doubt. Lewis' written statement provided no incriminating information not already contained in his oral statement, which was very similar. Even without Lewis' written statement, the remaining evidence (including Lewis' oral statement), standing alone, constitutes overwhelming proof of Lewis' guilt. Singleton, supra. The trial court correctly overruled Lewis' motion to suppress his statements to police.
The first assignment of error is overruled.
 SECOND ASSIGNMENT OF ERROR THE TRIAL COURT ERRED BY NOT ALLOWING THE STATEMENT OF CARLA DAVIS TO BE ADMITTED PURSUANT TO EVID.R. 804(B)(3).
Prior to the commencement of Lewis' trial Carla Davis, the child's mother, died. Before she died, however, Davis gave two statements to Lewis' attorney. One statement given on or about August 3, 1998, was tape recorded and transcribed. The other statement made on or about August 13, 1998, was given under oath. At trial Lewis attempted to admit Carla Davis' statements pursuant to Evid.R. 804(B)(3), but the trial court refused to admit that evidence. Lewis now argues on appeal that the trial court erred in refusing to admit Davis' statements.
The decision whether to admit a statement against interest pursuant to Evid.R. 804(B)(3) is a matter resting within the sound discretion of the trial court, and its decision in such matter will not be disturbed on appeal absent an abuse of discretion. Dayton v. Combs (1993),94 Ohio App.3d 291. An abuse of discretion connotes more than a mere error of law or an error in judgment. It implies an arbitrary, unreasonable, unconscionable attitude on the part of the trial court.State v. Adams (1980), 62 Ohio St.2d 151.
Evid.R. 804(B)(3) controls the admission of statements against interest made by declarants who are unable to testify at trial:
 (B) Hearsay exceptions. The following are not excluded by the hearsay rule if the declarant is unavailable as a witness:
* * *
 (3) Statement against interest. A statement that was at the time of its making so far contrary to the declarant's pecuniary or proprietary interest, or so far tended to subject the declarant to civil or criminal liability, or to render invalid a claim by the declarant against another, that a reasonable person in the declarant's position would not have made the statement unless the declarant believed it to be true. A statement tending to expose the declarant to criminal liability, whether offered to exculpate or inculpate the accused, is not admissible unless corroborating circumstances clearly indicate the truthworthiness of the statement.
Having died before trial, Carla Davis was obviously unavailable as a witness. Evid.R. 804(A)(4). However, the essence of Carla Davis' statements that Lewis sought to admit at trial was simply that she did not see Lewis shake the baby or strike him or do anything else that would have injured the child. Such a statement is in no way contrary to Davis' pecuniary or proprietary interests. Morever, such a statement does not subject Davis to civil or criminal liability. Davis did not admit in her statements to mistreating the child herself or to any other wrongdoing. She merely stated that she did not see Lewis do anything to injure the child. That, of course, leaves open the possibility that Lewis did something and Davis simply did not see it. The fact that Davis did not see Lewis injure the child does not demonstrate that it was Davis who injured the child, thereby subjecting her to civil or criminal liability.
Because Carla Davis' statements are not contrary to her pecuniary or proprietary interests, and do not expose her to either civil or criminal liability, the requirements for admission as a statement against interest have clearly not been met. The trial court did not abuse its discretion in refusing to admit this evidence.
The second assignment of error is overruled. The judgment of the trial court will be affirmed.
GRADY, P.J. and WOLFF, J., concur.
Hon. George M. Glasser, Retired from the Court of Appeals, Sixth Appellate District, sitting by assignment of the Chief Justice of the Supreme Court of Ohio.