Filed 6/13/22  P. v. Montoya CA2/8

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION EIGHT

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>PEDRO MONTOYA,<br><br>    Defendant and Appellant. | B317260<br><br>(Los Angeles County<br>Super. Ct. No. MCR052012) |

APPEAL from a judgment of the Superior Court of Los Angeles County, Mitchell C. Rigby, Judge.  Affirmed.

Nuttall Coleman and Drandell, Roger T. Nuttall; Page Law Firm and Edgar E. Page, for Plaintiff and Appellant.

Xavier Becerra and Rob Bonta, Attorneys General, Lance E. Winters, Chief Assistant Attorney General, Michael P. Farrell, Assistant Attorney General, Louis M. Vasquez, Rachelle A. Newcomb, Amanda D. Cary and Lewis A. Martinez, Deputy Attorneys General, for Plaintiff and Respondent.

————————————

A jury convicted Pedro Montoya of four counts of committing a lewd and lascivious act on a child under age 14 (Pen. Code,[1] § 288, subd. (a)) and one count of sodomy on a child under age 10 (§ 288.7, subd. (a)). Counts 1 through 4 involved appellant's niece J., while count 5 involved appellant's niece L. Both girls were eight years old at the time of the offenses. The jury found true the multiple victim allegations for counts 1, 2, 3, and 5 (§ 667.61, subds. (b) & (e)). The trial court sentenced appellant to a term of 25 years to life for the section 288.7 sodomy and, pursuant to section 667.61, four consecutive terms of 15 years to life for the section 288 convictions, for a total of 85 years to life in prison.

Appellant contends the trial court erred prejudicially in admitting a statement he made to police without being advised of his right to remain silent as required by *Miranda v. Arizona* (1966) 384 U.S. 436 [16 L.Ed. 2d 694, 86 S.Ct. 1602] (*Miranda*), and in denying his motion for a new trial made on the same ground. Appellant also contends the prosecutor committed prejudicial misconduct by repeatedly using the word "victim" during trial, in violation of a trial court order; his trial counsel was constitutionally ineffective in failing to object to the use of the word; and the trial court erred in denying his motion for a new trial made on that ground. He contends the cumulative effect of these errors was prejudicial. Finally, he asserts his sentence of 85 years to life is cruel and unusual punishment. We affirm the judgment of conviction.

---

[1]    Undesignated statutory references are to the Penal Code.

# BACKGROUND

In April 2015, eight-year-old J. was living with her parents, siblings, maternal grandmother and appellant, her maternal uncle, at a residence on Vineyard. Her parents, grandmother and appellant each had separate bedrooms. J. and her siblings slept in the living room, or with their parents or grandmother.

One afternoon in April, J.'s father went to a store to purchase some cigarettes for appellant. J. was at home with appellant. When J.'s father returned from his errand, he entered appellant's room through that room's separate outside entrance. He saw J. on appellant's bed, lying on her left side facing appellant, with her hand extended toward appellant. Appellant was standing near the doorway, with his pants partly lowered. As J.'s father entered the room, J. retracted her hand and appellant pulled up or fixed his pants. J.'s father told appellant to leave the room so he could talk to J.

J.'s father told her she was not in trouble, and asked her what had happened. J. pointed to her chest and said: "He was touching me right here." J.'s father asked her why appellant had his pants down, and she replied: "Well, because I am touching for him too." She did not say what she was touching.

J. also told her mother that appellant had touched her. Her mother was shaking and crying after talking to J. J.'s mother and father confronted appellant about the incident. Appellant said, "I didn't do nothing. I didn't do nothing." J.'s father was angry and left to go to his mother's house. J.'s mother and the children joined him later that day. At some point, the mother contacted law enforcement.

On July 6, 2015, J. was interviewed by Angelica Limon (Limon), a child forensic interviewer for Madera County.

J. described two incidents involving appellant. J. said that in the more recent incident, when her father came into the room and startled appellant, appellant touched her "boobies" with his hand, first through her clothing and then by putting his hand under her clothing. J. described an additional incident which occurred when she and her cousin L. were sleeping in appellant's bedroom. When J. went to bed she was wearing a top, sweatpants and underwear. When she woke up, her sweatpants were on the floor, but she was still wearing her underwear and top. Her mother saw the pants on the ground and told J. to put them on and leave the room, and not to sleep there again. J. stated those were the only two incidents involving appellant.

On July 14, 2015, Madera Police Officer Brent Cederquist interviewed appellant about J.'s allegations at the Madera police station, in a locked interview room. The interview was videotaped, and the recording was played for the jury. Appellant described adjusting J.'s shirt on the day her father came into the room. He acknowledged touching her accidentally and briefly while doing so, but denied any further touching. He did not remember any incident where J. fell asleep in his bedroom and her pants ended up on the floor.

That same month, appellant's brother and sister-in-law found out about the incident with J. They asked their children if something similar had happened with them. Eight-year-old L. replied yes. She said appellant had touched her private area. L.'s mother contacted police.

On July 23, 2015, Josephina Roderick (Roderick), a child forensic interviewer for Madera County, interviewed L. L. described an incident which occurred when she was in appellant's bedroom with her two sisters and J. L. and J. were on

4

the bed with appellant; J. was on top of the sheets and L. was under them. Appellant put his hand under L.'s shorts and underwear and rubbed her private area where she went pee. L. did not like this and took his hand out of her pants. She then went outside.

On August 24, 2015, J. was again interviewed by Limon. J. described many more incidents of touching by appellant. She said that appellant touched her where she went pee and on her "boobies" more than 10 times, starting in April. He also made her touch his private on multiple occasions. This touching occurred in appellant's bedroom. J. described one touching incident in detail. It occurred when she was eight. She was in appellant's room watching The Little Mermaid 2 movie, when he took off his pants, put his hand on her "boobies" and moved her hand back and forth on his private. Something slimy came out of his private. When appellant was finished, J. fell asleep.

J. also described an incident when appellant put his private in her "tushy" where she would go "poop." His private felt hard. He moved it back and forth. It was very painful. Appellant stopped when he was tired. J. went to her grandmother's room.

Limon explained at trial that children do not always disclose everything the first time she interviews them, due to fear, guilt or embarrassment. She also explained that most children do not have a sense of time. More specifically, J. did not have a concept of time. Roderick also testified that children are not very good at providing temporal time spans, and so dating events is difficult for them. She further explained children are not necessarily precise about the number of times a touching occurred. In her experience, a child's use of the present tense

often indicates multiple incidents, whereas the use of the past tense often indicates a single instance.

At trial, J. testified at length about incidents with appellant. She first described an incident when she and appellant were in his bedroom on the bed, watching The Little Mermaid 2 movie. She said that his private where he peed moved back and forth against her private where she peed and it hurt. After the movie was over, his hand touched her private. When he was done, he went to the bathroom and J. went to her grandmother's room.

J. explained her parents learned of the touching when her father came into appellant's bedroom and startled him. J. was on the bed and appellant was standing, facing her. She said that appellant was wearing red shorts, slightly pulled down, and plaid underwear with a "hole" in it. She could see one of his hands on his private, moving up and down. Appellant was using his other hand to text. She did not touch appellant and he did not touch her. She told her father and then her mother what happened. Later, however, J. testified appellant had touched her private and her breast area during this encounter. He used one hand and continued texting with the other hand. She said this was the only time he touched her breasts.

J. also testified about the incident where she was on appellant's bed with appellant, L. and two cousins, J. fell asleep with her pants on. When her mother came in to wake her up, J. and her mother saw J.'s pants on the floor. J. was still wearing her underwear.

J. also testified about the incident where appellant put his private in her private area where she went "poop." He moved back and forth and it hurt. At some point he stopped and J. left

6

the room.  J. added that a gray liquid came out of appellant's private before he put it into her bottom.

J. testified that on one other occasion, she touched appellant's private.  She said this happened one time only.  It occurred when she was in his bedroom, doing her homework in front of appellant's television.  When she finished, she laid down on the bed to be more comfortable.  Appellant was in the bathroom.  When he came out, J. pretended to be asleep.  He took one of her hands, put it on his private and moved it back and forth.  J. then testified this was the time she saw the gray liquid come out of appellant's private.  When appellant went to the bathroom again, she left.

L. also testified at trial, and gave an account of the incident where appellant touched her private.  Her testimony was substantially similar to the account she gave in the forensic interview.

Appellant testified on his own behalf at trial.  He denied touching or sodomizing J. in the way she described.  He also denied touching L.'s vagina.  He testified it was "totally made up," but he had no idea why.

Appellant explained that on the day J.'s father came into the room, J. was doing homework and appellant was texting his girlfriend.  J's top was inappropriately low, and he told her to lift it up; at the same time he himself lifted the shirt up two or three inches.  J's father came in, gave appellant the cigarettes and left.  At some point shortly thereafter, J's mother asked J. what her father was talking about, but J. did not respond.  The mother then asked appellant what he did, and appellant replied: "I didn't do anything."  Appellant went to the front yard to smoke a cigarette, and at some point J.'s father came outside and accused

7

appellant of touching J. Appellant then left the house to get a beer, and when he returned, J. and her parents were gone. That day was the last time appellant talked to J.'s parents.

Appellant testified he was not forced to meet with Officer Cederquist, but did so voluntarily because he had nothing to hide. Appellant was not initially nervous, but then Officer Cederquist began making accusations. The officer would not accept appellant's answer that he did not do it. Appellant felt he had to answer the questions and did not feel free to leave.

## DISCUSSION

A. *Any Error in the Admission of Appellant's Statement to Police Was Not Prejudicial*

Appellant contends the trial court erred in overruling his objection to admission of his statement to police, which he asserts was obtained in violation of *Miranda*. He also contends the trial court erred in denying his motion for a new trial, made on the same ground. We find any error in the admission of appellant's statement harmless beyond a reasonable doubt. (*Chapman v. California* (1967) 386 U.S. 18 [17 L.Ed. 2d 705, 87 S.Ct. 824].) Put differently, we find beyond a reasonable doubt that the jury would have reached the same verdict if appellant's statement had not been admitted.

Police are required to inform individuals in custody of their *Miranda* rights before they are questioned. (*Stansbury v. California* (1994) 511 U.S. 318, 322 [128 L.Ed. 2d 293, 114 S.Ct. 1526].) If police take a suspect into custody and then interrogate the person without such an advisement, the person's responses cannot be introduced into evidence to establish guilt. (*Berkemer*

*v. McCarty* (1984) 468 U.S. 420, 429 [82 L.Ed. 2d 317, 104 S.Ct. 3138].)

Appellant clearly acknowledges in both his opening and reply briefs on appeal that his statement during the interview was a denial of wrongdoing. According to appellant, when Officer Cederquist "specifically accused Appellant of not telling the truth and then expressed the belief that the child's version of what occurred was in fact the truth, Appellant specifically began to voice an objection as to what he was being accused of doing." "Appellant repeatedly denied that he did anything wrong." Appellant did admit to touching the child once, but "explained that he was only straightening the child's shirt because it was really low." "Appellant attempted to provide innocent reasons for why there was a misunderstanding."

Appellant contends his statement to police nevertheless must be considered incriminating because the prosecutor referred to it in closing argument, and the jury asked to watch the videotape of the interview during deliberations. The prosecutor did refer to isolated replies by appellant to Officer Cederquist's questions. Immediately before closing argument, however, appellant himself had testified about the interview and given a different perspective. The video was played for the jury on June 20, 2017, appellant testified on June 27, 2017, and closing argument began on June 28, 2017. The most likely explanation for the jury's request was that it had forgotten details of the video and wanted to see whose version of the interview was correct. In this context, we do not find the jury's request to re-watch the video a manifestation of prejudice, particularly since we find appellant's overall response during the interview is most

reasonably understood as a denial of any improper touching, not a confession or admission of guilt.

The evidence of molestation was strong. Although J. did give somewhat varying accounts of appellant's acts of sexual touching, the two child forensic examiners explained children have difficulty with the concept of time, and Limon specifically testified J. did not have a concept of time. Roderick explained children often have difficulty articulating how many incidents of molestation occurred.[2] At trial, faced with open-ended questions, J. did not claim multiple (unidentified) instances of each type of touching as she had in the second interview.

The behavior of J.'s parents was strong evidence that J.'s initial account of appellant's behavior was quite believable. They immediately moved out of the house the same day that J's father found J. on the bed in appellant's room. Although it is not clear how long they remained out of the house, appellant stated he had not spoken with his sister since that day.

J's father's account of finding appellant with his pants partly lowered also corroborated J.'s account that appellant was sexually interested in her. Although J's father was a convicted felon several times over, there was no apparent reason for him to lie about this particular matter. J's mother partially

---

[2]     Roderick herself relied on verb tense for cues about the number of incidents. It is worth noting that during the second interview J. simply answered yes to Limon's questions about the number of occurrences. Limon asked if the touching occurred more than once, then asked more than three times, and then asked if it occurred more than 10 times. J. simply responded: "Uh huh" or "Yeah" to each question.

corroborated the father's testimony by describing his anger after finding J. in appellant's bedroom.

L.'s account of her own molestation by appellant was consistent and credible, and partially corroborated J's account of one encounter with appellant: the setting for L.'s molestation matched an account by J of being in appellant's bedroom with L. and J. falling asleep. In J.'s account, her sweatpants were on the floor when she awoke. Further, L.'s testimony showed appellant was sexually interested in girls of J.'s age.

In contrast, although appellant was adamant that the accusations were made up and false, he could offer no explanation for why J. and L. would make up such accusations.[3] He did not believe L's parent would have L. make up her accusation. Appellant said L's father (appellant's brother) was still supportive of him. Appellant acknowledged J.'s mother (his sister) did not want to testify against him and was crying on the stand. He did not offer any reason why his sister might have made J. lie.

In sum, appellant could offer no explanation for why any of those involved would make up the accusations. We find the evidence of molestation was such that the jury would have convicted appellant even without hearing the pre-arrest statement he gave to police. The admission of appellant's un-Mirandized statement was harmless beyond a reasonable doubt.

---

[3]    Appellant did maintain the incident when J.'s father came into the room was innocent, and that he had simply been adjusting J.'s shirt and accidentally and briefly touched her. J., of course, claimed more extensive and sexual touching occurred.

B.      *Brief References to J. as a Victim Were Not Misconduct and Were Harmless.*

Appellant contends the prosecutor committed misconduct by failing to obey "the trial court's order to not use the term 'victim' and repeatedly used the term, both indirectly, directly and/or circumstantially." Appellant has overstated the trial court's order.

Before trial, appellant brought a number of motions in limine, one of which, No. 14, sought an order precluding the use of the term victim to refer to the two children. Appellant requested an order that "the Prosecution, its witnesses, and any other persons that address the jury are prohibited from referring to, calling, commenting upon or introducing evidence that refers to Jane Doe as the 'victim.' " At the hearing on the motions, the trial court referred to motion No. 14, stating "that was the reference to Jane Doe as 'victim,' and I will grant that."

After trial, at the hearing on appellant's motion for a new trial, the trial court explained: "[W]ith regard to the issue concerning use of the word 'victim,' the spirit of the ruling that this [c]ourt made in that regard was that the children were not to be referred to as 'victim'; some alternative such as 'complaining witness' was to be used." The court added: "Also with regard to the spirit of the ruling concerning 'victim,' it was not directed to any form of the word, such as 'victim advocate,' 'victim services,' or 'victim of sexual assault.' That was not the order and never was the order."

Appellant's descriptions of the record citations show that they fall into three categories: 1) use of the word "victim" in contexts not prohibited by the trial court's order: "victim services," "victimology," "victim advocate," and "sexual assault

12

victims";  2) use of the word "victim" to refer directly to one of the children, but which occurred outside the presence of the jury; and 3) references to J. as a "victim" in front of the jury.  Although appellant's citations to the record are inconsistent in that he appears to use a different version of the reporter's transcript to support his argument, we do not find the argument forfeited on appeal.

As the trial court made clear in ruling on the new trial motion, its order did not apply to terms such as "victim advocate" or "victimology."  We see no error in this ruling.

Appellant's motion can only be reasonably understood as seeking to entirely preclude the use of the word "victim" in front of the jury.  Nothing in the trial court's statement granting the motion suggests that it was imposing a broader ban on such usage, which applied even outside the presence of the jury.  Thus, the People (and the prosecution witnesses) did not violate the trial court's order by referring to the children as victims outside the presence of the jury.  Even assuming for the sake of argument that it would have been the better practice not to use the term to refer to the children even outside the presence of the jury because such usage might increase the inadvertent use of the term in front of the jury, appellant has not cited, and we are not aware of, any authority finding such behavior to constitute misconduct.[4]

---

[4]     We see only two such direct references.  The first was made by Limon in a hearing pursuant to Evidence Code section 1360, held before the jury was empaneled.  Nevertheless, the prosecutor reminded the witness not to use the word victim.  The second reference was made by the prosecutor, in summarizing J.'s father's interview by police, during argument before the court and outside the presence of the jury.

13

Once these two categories are eliminated, there remain only two uses of the word "victim" to refer directly to one of the children in the presence of the jury. In reading the First Amended Information to the jury, the clerk read: "in that the said defendant did commit the following act upon victim, [J.]." This is the only time in reading the five counts of the information that the clerk used the word "victim" before one of the children's names. Appellant points out that the jury had a copy of this document for use during deliberations. While this appears to be true, appellant has not provided any record citation to show whether that document was redacted or not.

The second use of the word victim was by defense counsel in closing argument when he argued: "[J.] denied it and she lied about it. And I'm sorry to say that. I think that she is as much a victim in this case as anybody else. But that's the truth. That's what happened. And isn't that reasonable doubt?" In context, defense counsel appears to be referring to J. as a victim of the investigation and prosecution of the case.

Although appellant did not object to the clerk's use of the word "victim," we will exercise our discretion to consider whether the use was misconduct or prejudicial. It was not. There is no basis to find prosecutorial misconduct or prejudice to appellant from one isolated use of the word victim by the clerk, particularly since that use occurred in connection with the reading of the charging document in the case. The jury was well aware this document contained allegations that the prosecution was required to prove.

To the extent appellant contends his trial counsel was ineffective in failing to request an order banning all uses of the word victim, this claim fails on direct appeal. Appellant has not

cited any authority which would support such a broad ban, and hence has not shown such a motion would have been successful, let alone that he would have received a more favorable outcome at trial. (*People v. Price* (1991) 1 Cal.4th 324, 387 [counsel is not ineffective for failing to make futile or unmeritorious motions]; *People v. Mai* (2013) 57 Cal.4th 986, 1009 [defendant must show that but for counsel's deficient performance a more favorable outcome was reasonably probable].)

C.     *Appellant Has Forfeited His Claim of Cruel and Unusual Punishment*

Appellant contends his sentence of 85 years to life in prison constitutes cruel and unusual punishment in violation of the California and United States Constitution. Appellant has forfeited this claim by failing to adequately raise it in the trial. His counsel simply stated that "for the record, we would object to the imposition of consecutive sentences. [¶] . . . It's appropriate for me to object to that applicability based upon constitutional grounds, including, but not limited to, the prohibition against cruel and unusual punishment, which, I shall submit, an 85-year-to-life sentence does, indeed, constitute cruel and unusual punishment."

An analysis of whether a sentence constitutes cruel and unusual punishment "requires a 'fact specific' inquiry [citation], and those facts and their import to the analysis must be developed in the trial court. (*People v. Russell* (2010) 187 Cal.App.4th 981, 993 [114 Cal.Rptr.3d 668] [the claim involves the type of issue that should be raised in trial court because trial judge, after hearing evidence, is in a better position to evaluate mitigating circumstances and determine their impact on constitutionality of sentence].)" (*People v. Brewer* (2021)

15

65 Cal.App.5th 199, 212.) The failure to do so forfeits the claim. (See *ibid*.)

Further, appellant has not even attempted to remedy this deficiency on appeal by, for example, citing legal authority involving similarly situated offenders (for example, first-time adult offenders who are convicted of multiple sexual offenses against two young victims) or by pointing to facts in the record concerning his individual culpability (apart from his lack of prior convictions) or the nature of the offenses.[5]

To the extent appellant is claiming ineffective assistance of counsel in connection with this issue, the claim fails on direct appeal. The lack of relevant facts in the record on appeal precludes a showing that competent trial counsel could have had appellant's sentence reduced on the ground of cruel and unusual punishment.

D.      *There Was No Cumulative Prejudice.*

Appellant contends that even if the errors in this case are not prejudicial when considered individually, they are when considered cumulatively. We have found no prosecutorial misconduct related to the used of the term "victim" and no possible prejudice from the clerk's single use of the word to refer to J. Thus, there is no cumulative prejudicial effect.

---

[5]      Appellant appears to believe that the fact that the victims' statements were not consistent somehow warrants a lesser punishment for him. He is mistaken.

## DISPOSITION

The judgment is affirmed.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

STRATTON, P. J.

We concur:

GRIMES, J.

WILEY, J.

17